**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Fabio ALONSO, Pedro Izaguirre, Robert Derringer, Julio Ojeda, Defendants-Appellants.**

No. 83–5072.

United States Court of Appeals, Eleventh Circuit.

Aug. 30, 1984.

Lawrence N. Rosen, Miami, Fla. (Court-appointed), for Alonso.

Roy E. Black, Black & Furci, Miami, Fla., for Izaguirre.

Thornton, Rothman, Adelstein & Moreno, David Rothman, Miami, Fla., for Derringer.

Kravitz & Von Zamft, Michael L. Von Zamft, Hialeah, Fla., for Ojeda.

Stanley Marcus, U.S. Atty., Michael P. Sullivan, Jon May, Linda Collins-Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before HENDERSON and CLARK, Circuit Judges, and ATKINS *, District Judge.

ALBERT J. HENDERSON, Circuit Judge:

Fabio Alonso, Pedro Izaguirre, Julio Ojeda and Robert Derringer, defendants-appellants, were charged along with other Dade County, Florida homicide detectives in a forty-count indictment alleging conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68, substantive RICO violations, various drug related crimes, civil rights violations and infractions of the federal income tax laws. After a four month trial in the United States District Court for the Southern District of Florida, a jury found the appellants guilty of a number of charges, acquitted them of others and was unable to reach a verdict on certain counts against Derringer.[1] On appeal, the appel-

---

* Honorable C. Clyde Atkins, U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Fabio Alonso was convicted of conspiring to conduct and conducting an enterprise through a pattern of racketeering in violation of 18 U.S.C. §§ 1962(c), 1962(d), 1963; unlawfully arresting persons under color of state law, 18 U.S.C. §§ 2, 242; conspiracy to distribute cocaine, 21 U.S.C. §§ 841(a)(1), 846; and income tax evasion, 26 U.S.C. § 7201. He was acquitted of possession of cocaine with intent to distribute. Alonso received a total sentence of ten years in prison.

Pedro Izaguirre was found guilty of conspiring to conduct an enterprise through a pattern of racketeering, 18 U.S.C. §§ 1962(d), 1963; three counts of unlawfully appropriating prop-

lants allege numerous errors during the trial. We affirm.

A central figure in this case is Mario Escandar. Detectives Rafael Hernandez and Ojeda of the homicide section of the Metro-Dade County Public Safety Department arrested Escandar in 1977 for kidnapping. Escandar became friendly with Hernandez and Ojeda as well as with Detectives Alonso, Izaguirre, Derringer, Charles Rivas, George Pontigo and Charles Zatrapalek. The men often visited Escandar at his home after he was released on bond.

While Alonso and Ojeda were in his house, Escandar ingested cocaine in their presence. Ojeda received some of the drug and took it with him. Eventually many of the defendants began using cocaine supplied by Escandar or Melvin Adler, Escandar's associate. Escandar even gave them money and gifts and provided prostitutes for them.

During this period of time, the kidnapping charges against Escandar were still pending. In an effort to dispose of the case, Escandar sought Ojeda's help in reducing the penalty. In response to Escandar's inquiries, Ojeda assured him that he could receive a six month sentence without too much trouble. According to Escandar,

he spent $500.00 to $1,000.00 a day on the parties for the officers in his quest for a light sentence. Ojeda told the prosecutor that Escandar was providing him with good contacts and information and that he did not want Escandar to spend much time in jail. Based on Ojeda's recommendations, Escandar, facing a maximum of life imprisonment, was sentenced to fifty-nine days in jail and five years probation.

The appellants ultimately participated in an illicit enterprise involving drugs and money. Because of the voluminous evidence of their illegal activities, it would not be practical to relate in detail here each of the transactions. However, examples of the various schemes employed by the officers are helpful to an understanding of the enormity of their operations.

One such scheme involved Armando Fiallo, Sr. The appellants had received information that Fiallo kept a large amount of cash and drugs in his apartment. As a pretext to gain entry into the apartment, they obtained an arrest warrant for another person supposedly living with Fiallo. Thirty pounds of marijuana and $62,735.00 in cash were confiscated and placed in the police property room. Fiallo was killed a week later. Izaguirre formulated a plan to

---

erty, 18 U.S.C. §§ 2, 242; and income tax evasion, 26 U.S.C. § 7206. He was acquitted of substantive racketeering, possession of cocaine with intent to distribute, possession of marijuana with intent to distribute, conspiracy to possess cocaine with intent to distribute, conspiracy to defraud the government, tax evasion and two counts of unlawfully appropriating property. Izaguirre was sentenced to a total of eight years in prison.

Julio Ojeda was convicted of conspiring to conduct and conducting an enterprise through a pattern of racketeering, 18 U.S.C. §§ 1962(c), 1962(d), 1963; two counts of unlawfully arresting persons under color of state law, 18 U.S.C. §§ 2, 242; two counts of possession of cocaine with intent to distribute, 18 U.S.C. § 2, 21 U.S.C. § 841(a)(1); unlawfully appropriating property, 18 U.S.C. §§ 2, 242; conspiracy to defraud the government, 18 U.S.C. § 371; and two counts of tax evasion, 26 U.S.C. § 7201. He was acquitted on two counts of conspiracy to possess with intent to distribute cocaine, conspiracy to distribute cocaine, possession of cocaine with intent to distribute, possession of marijuana with intent to distribute, conspiracy to possess mari-

juana and quaaludes, and two counts of unlawfully appropriating property. Ojeda received sentences aggregating fourteen years imprisonment.

Robert Derringer was convicted of unlawfully appropriating property, 18 U.S.C. §§ 2, 242; and income tax evasion, 26 U.S.C. § 7201. He was acquitted of two counts of unlawfully appropriating property, two counts of possession with intent to distribute cocaine, possession of marijuana with intent to distribute, conspiracy to possess cocaine with intent to distribute, and conspiracy to possess marijuana and quaaludes with intent to distribute. The jury was unable to reach a verdict on the substantive charges of racketeering, conspiracy to conduct an enterprise through racketeering, possession of cocaine with intent to distribute, unlawful appropriation of property, unlawfully arresting persons under color of state law and conspiracy to defraud the government. Derringer was sentenced to six years imprisonment. Charles Rivas, Thomas Gergen, Steven McElveen and Raymond Eggler were acquitted of all charges and are not involved in this appeal.

procure the money still in the property room and to divide it with the others. A release authorized by Derringer listed Carlos Fernandez as Fiallo's next of kin and Fernandez picked up the money from the property room custodian. Neither Magda Fernandez, Carlos' wife, nor Armando Fiallo, Jr. was aware that Fernandez was related to Fiallo. The officers claimed that Fernandez arrived after they searched Fiallo's apartment and stated that he owned the money. Yet there was no record of such a claim by Fernandez. Izaguirre admitted that he knew Fernandez, who worked with Izaguirre's brother-in-law at an automobile dealership, but denied any part in the theft of the money.

In yet another instance, Escandar set up a device to duplicate paper currency by which he supposedly transferred the image of a twenty or a hundred dollar bill onto a bleached one dollar bill. Instead, Escandar simply switched the money furnished him for paper. One of Escandar's victims, Raul Pascaul and his associates returned to Escandar's home after they discovered the theft. Ojeda was called for help. He and Alonso stopped Pascaul and discovered a gun and cocaine. They arrested Pascaul and the others. Despite the cooperative efforts of these officers, Escandar said it was enough that he had taken $50,000.00 from Pascaul and suggested to Ojeda that he tell the prosecutor that they had made an illegal search of Pascaul and his arrested friends. The charges were later dropped.

In October, 1978, Stacy Needles was killed while attempting to purchase 800 pounds of marijuana. The defendants found a large amount of cash in the trunk of Needles' car. Izaguirre deposited $33,700.00 in the property room. To retrieve the money, Izaguirre signed a release for attorney Roy Rodriguez, who purportedly was representing Yordy Hernandez, the supposed mastermind behind the marijuana purchase. Hernandez and Arvilla Needles, Stacy Needles' mother, however testified that they did not know Rodriguez. Hernandez said he never was represented by Rodriguez and had not received any money.

Mrs. Needles had retained another attorney to procure her son's property.

The appellants also agreed to assist Escandar to steal money from Roy Tateishi by the money duplicating hoax. As part of the plan, Tateishi left Escandar's home to return in thirty minutes, but, worried about leaving his money with Escandar, insisted that Adler accompany him and his bodyguard. Ojeda and Zatrapalek stopped Tateishi's car and discovered cocaine and currency. All three men were arrested. Ojeda gave Tateishi a receipt for $12,000.00. Adler was later released. Escandar paid the officers $10,000.00 and one ounce of cocaine for their aid. Tateishi's money was claimed from the police property room by Oscar Rodriguez, Tateishi's attorney. Derringer prepared the property release and gave it to Izaguirre for his signature. Tateishi, however, stated that he did not authorize the transfer. Zatrapalek testified that the money was divided among Rodriguez and the officers. None of the money collected during their dealings with Escandar was reported by the appellants on their income tax returns.

## I.

Unbeknownst to the defendants, Escandar had been an informant for the Federal Bureau of Investigation (FBI) since 1972. In fact, he had been relaying information concerning their activities. Without Escandar's knowledge, the FBI procured a warrant to conduct electronic surveillance of his home. The district court denied a motion to suppress the evidence gained through such surveillance.

An application for an order authorizing electronic surveillance must include

a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(c). Based on the application, the district court may grant an ex parte order if it determines that "normal investigative procedures have been tried

and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous ...." *Id.* at § 2518(3)(c).

These statutory requirements are designed to insure that wiretapping is neither "routinely employed as the initial step in criminal investigation," *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 1827, 40 L.Ed.2d 341, 353 (1974), nor "resorted to in situations where traditional techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225, 236 n. 12 (1974). Yet, "it is not necessary to show a comprehensive exhaustion of all possible techniques." *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir.1978).[2] *See also United States v. Matya*, 541 F.2d 741, 745 (8th Cir.1976), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977) (wiretapping not required only as a last resort).

FBI Special Agent Andre Fortier prepared the affidavit in support of the government's application based upon information supplied by Escandar and others. The affidavit referred to Escandar and two other sources, Source 1 and Source 2. Although not clear from the affidavit, Escandar and Source 1 were the same person. Fortier considered alternative investigative techniques. The FBI made inquiries at the Dade County Public Safety Department but the defendants soon learned of the FBI's interest in their activities. Physical surveillance had proven unsuccessful. The placement of undercover agents within the police department was very difficult and highly dangerous. The use of subpoenas or open questioning of the officers certainly would jeopardize the investigation. A grand jury would be unable to uncover the entire scope of the conspiracy. No probable cause existed at the time to justify the issuance of a search warrant. Because the defendants were alerted to the investigation, the lives of the confidential informants were in danger. The defendants' position as police officers and their access to police resources made the use of alternative investigatory techniques especially problematical. *See* Record at 379–81.

The appellants primarily urge that the affidavit was defective because it failed to state that Escandar and Source 2 represented reliable and valuable alternative investigatory sources who could have continued to supply information. In fact, Escandar apparently was providing information similar to that received by the FBI through the electronic surveillance.

■ Contrary to the appellants' argument, the statute does not require an initial exhaustion of all conceivable investigatory techniques. The statute was not intended

> to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.

*Hyde*, 574 F.2d at 867 (*quoting United States v. Robertson*, 504 F.2d 289, 293 (5th Cir.1974), *cert. denied*, 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975)). There need not be an exhaustive recitation of the progress of the investigation, excluding every possible line of inquiry. The former Fifth Circuit Court of Appeals in *Hyde* held that "[i]t is enough if the affidavit explains the prospective or retroactive failure of several investigative techniques that reasonably suggest themselves." *Id.*

■ The affidavit in this case satisfies the statutory requirements. The affiant considered the efficacy of numerous alternatives. Those investigatory methods already tried by the FBI had failed and others presented little likelihood of success or were too dangerous. The affidavits must be read in a "practical and commonsense fashion," *United States v. Brick*, 502 F.2d 219, 224 n. 14 (8th Cir.1974), and the district court is clothed with broad discretion in its consideration of the application. *United States v. Jackson*, 549 F.2d 517, 537 (8th Cir.), *cert. denied sub nom Mu-*

---

**2.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

*hammad v. United States,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977). The order will not be overturned "simply because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not." *Hyde,* 574 F.2d at 867.

The appellants attempt to distinguish *Hyde* because in that case, law enforcement officers employed numerous informants and investigated the drug smuggling conspiracy for two years. The FBI here did utilize wide-ranging investigative techniques. The government could not wait two years. The defendants were police officers who could easily detect any inquiry made about them and they had at their disposal the resources of the police department. The affidavit stated that the lives of the informants could be in danger which contradicts the appellants' insistence that the government rely solely on Escandar and other informants. In any event, the standard set forth in *Hyde* is not limited to its particular facts. The district court correctly denied Alonso's motion to suppress.

## II.

■ At the trial, the government sought to introduce evidence of the defendants' personal use of cocaine. The district court admitted the evidence over the defendants' objections. For evidence of extrinsic offenses to be admissible it must comply with Fed.R.Evid. 404(b).[3] The rule mandates a two part analysis.

First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substan-

tially outweighed by its undue prejudice and must meet the other requirements of [Fed.R.Evid.] 403.

*United States v. Beechum,* 582 F.2d 898, 911 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979) (footnote omitted).

The evidence of the extrinsic offense here was relevant for reasons beyond a showing of the character of the defendants. Their use of cocaine related to the acceptance of the officers by Escandar and Adler into their criminal ventures. Furthermore, the consumption of cocaine by the defendants strengthened their trust in one another. *See United States v. Talavera,* 668 F.2d 625, 630–31 (1st Cir.), *cert. denied sub nom Pena v. United States,* 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982) (use of heroin relevant to showing detectives' relationship to the drug transaction and to the other participants).[4]

The second prong of the *Beechum* test requires that the probative value of the evidence not be substantially outweighed by its undue prejudice to the defendants. That the evidence may be adverse to the defendants is not enough. The appellants fail to meet this test. As noted above, the evidence was probative of their acceptance into the criminal fold. Any prejudice to the appellants did not substantially outweigh the probative value of their personal cocaine use. *See United States v. Tunsil,* 672 F.2d 879, 881 (11th Cir.), *cert. denied,* 459 U.S. 850, 103 S.Ct. 110, 74 L.Ed.2d 98 (1982) (extrinsic evidence of a heroin sale not of a heinous nature or likely to incite the jury). The district court did not abuse its discretion by admitting the evidence. *United States v. McMahon,* 592 F.2d 871,

---

**3.** Fed.R.Evid. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**4.** The appellants contend that *United States v. Reed,* 700 F.2d 638 (11th Cir.1983) compels exclusion of this extrinsic offense evidence. The defendant's use of marijuana was held to be inadmissible in his prosecution for mail fraud. The court determined that the evidence was irrelevant to any issue other than the defendant's character. Here, the enterprise concentrated mostly on trafficking in cocaine. As such, *Reed* is distinguishable from this case.

873 (5th Cir.), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979).

### III.

■ An element of the offense of conspiracy to violate RICO is the membership of the defendant in an enterprise. 18 U.S.C. § 1962(d). An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The two parts of the statutory definition identify distinct types of enterprises, "those that are recognized as legal entities and those that are not." *United States v. Turkette,* 452 U.S. 576, 582, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246, 254 (1981).

> The indictment alleged, in part, that
> 1. At all times material herein, Dade County was a political subdivision of the State of Florida, pursuant to Article VIII, § 1(a) of the Florida Constitution.
> 2. At all times material herein, the Dade County Public Safety Department was the law enforcement agency in Dade County empowered to enforce the laws of Dade County and of the State of Florida, pursuant to Article XII, § 2–91, Dade County Ordinances.
> 3. At all times material herein, the Dade County Public Safety Department, Homicide Section, constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), the activities of which affected interstate commerce.

The appellants urge that the indictment specifically charged them with participating in an enterprise constituting a legal entity. The district court, in instructing the jury, read the entire statutory definition of an enterprise and stated that "the Government need not prove which kind of enterprise the Public Safety Department, Homicide Section, was, only that it was one of those enumerated in the statute." Transcript at 14,323. The district court, the

appellants claim, thereby constructively amended the indictment by instructing the jury on an alternative definition of an enterprise than that charged in the indictment.

We find this argument unpersuasive. The indictment charged that the homicide section was an enterprise as defined by the statute. There was no election of one part of the definition of an enterprise over another. In *United States v. Lemm,* 680 F.2d 1193, 1198 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983), cited by the appellants, the indictment expressly alleged an enterprise of persons "associated in fact." The indictment here contains no such limiting phraseology. The first two paragraphs refer to the Florida constitution and county ordinances. That does not mean that the government is restricted to proving that the homicide section constituted a legal entity. We will not imply a choice of theories by the government without a clearer indication of intent.[5]

### IV.

The jury acquitted Izaguirre of the substantive racketeering charges but convicted him of conspiring to violate RICO. The district court denied his motion for judgment of acquittal on the conspiracy count. Izaguirre urges that, in the absence of substantive racketeering convictions, he cannot be held liable for a RICO conspiracy.

The court considered this issue in *United States v. Elliott,* 571 F.2d 880 (5th Cir.), *cert. denied sub nom. Hawkins v. United States,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). The defendant's conduct constituted both an overt act for a RICO conspiracy charge and a substantive offense. The court rejected the argument that acquittal of a substantive offense bars the consideration of evidence of that offense in determining the conspiracy charge. "An acquittal on a substantive offense does

---

5. Because the appellants do not dispute that the homicide section constituted a "group of individuals associated in fact", we need not consider whether it was also a legal entity.

not preclude a verdict of guilty on a count charging a conspiracy to commit such a substantive offense." *Id.* at 887–88 n. 5 (*quoting United States v. Carlton,* 475 F.2d 104, 106 (5th Cir.), *cert. denied,* 414 U.S. 842, 94 S.Ct. 100, 38 L.Ed.2d 80 (1973)).

The court summarized the government's burden under a RICO conspiracy in *United States v. Sutherland,* 656 F.2d 1181 (5th Cir.1981) (Unit A), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982).

> Strictly speaking, the government need not have proven that two [acts of racketeering activity] were in fact committed. This case was not brought under the substantive RICO provisions, but is instead based on the defendants' *conspiracy* to violate such provisions. The government need not prove in a conspiracy case that a substantive crime was actually committed, but instead need demonstrate that some "overt act" was taken in furtherance of a conspiracy to commit a substantive crime.

*Id.* at 1186–87 n. 4 (emphasis in original). More recently, this court held that a RICO conspiracy does not require even proof of the commission of an overt act. *United States v. Coia,* 719 F.2d 1120, 1124 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984).

Izaguirre relies on language in *Elliott, supra,* that he must be convicted of substantive acts before he can be guilty of a RICO conspiracy.

> To be convicted as a member of an enterprise conspiracy, an individual, by his words or actions, must have objectively manifested an agreement to participate directly or indirectly, in the affairs of the enterprise *through the commission of two or more predicate crimes.*

571 F.2d at 903 (emphasis in original). This passage does not support Izaguirre's position. *Elliott* emphasized the presence of an agreement to violate RICO. It did not mandate an initial conviction of substantive crimes. Instead, the court used the substantive convictions to bolster the evidence of an agreement.

> Where, as here, the evidence establishes that each defendant, over a period of years, committed several acts of racketeering activity in furtherance of the enterprise's affairs, the inference of an agreement to do so is unmistakable.

*Id.*

In other instances, however, the requisite agreement may be proved without any substantive RICO convictions. The detectives were charged under 18 U.S.C. § 1962(d) with conspiring to violate 18 U.S.C. § 1962(c), which requires evidence of a pattern of racketeering activity.[6] Izaguirre essentially contends because of his acquittal on the substantive RICO counts, the government failed to prove he agreed to participate in a pattern of racketeering activity.

■ That proposition was rejected in *United States v. Carter,* 721 F.2d 1514 (11th Cir.1984). "The statutory language itself imposes no requirement that the defendant must agree to participate in the conduct of an enterprise's affairs only by personally committing two predicate acts." *Id.* at 1529 (footnote omitted). To make out a pattern of racketeering activity in a RICO conspiracy, the government must either show the defendant agreed to participate in an enterprise with the objective of violating a substantive RICO provision,[7] or prove that he personally agreed to commit two or more predicate acts. *Id.* at 1531. In a RICO conspiracy, therefore, the agreement and not the actual commission of the substantive crimes is necessary to a conviction. There is no contention that the government failed to produce sufficient evi-

---

**6.** 18 U.S.C. § 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce to conduct or participate, directly or indirectly, in the conduct of such enter-prise's affairs through a pattern of racketeering activity.

**7.** In that case, "[i]t is enough that the defendant agreed to the commission of two predicate acts." *Id.* at 1531. He need not agree to commit them personally.

dence of his agreement either to commit at least two predicate acts or to become involved in the enterprise with the objective of violating a substantive RICO provision, so we need not address that question. We hold only that conviction of substantive RICO offenses is not an absolute prerequisite to conviction under the RICO conspiracy provisions.

## V.

▆▆▆▆ Based on the thefts of money from the property room of the police station, Izaguirre was indicted for violating the civil rights of Arvilla Needles, Armando Fiallo, Jr. and Roy Tateishi. 18 U.S.C. §§ 2, 242.[8] On appeal, Izaquirre challenges the sufficiency of the evidence to support his conviction of these charges. The standard of review in this circuit is whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (Unit B *en banc*) *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983) (footnote omitted).[9] We must view the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and make all inferences and credibility choices in support of the jury verdict. *United States v. Prows*, 728 F.2d 1398, 1401 (11th Cir.1984). *See also United States v. Rojas*, 731 F.2d 707, 710 (11th Cir.1984).

▆▆▆ Izaguirre initially contends the government failed to prove that Stacy Needles owned the money taken from the property room at the police station. Izaguirre placed the $33,700.00 in the police property room designating Stacy Needles as the owner. Transcript at 7,381–82. Yordy

Hernandez, to whom Izaguirre later claimed the money belonged, stated that he never claimed the money himself or through Roy Rodriguez. *Id.* at 12,265. In fact, Hernandez said "that the money man was Stacy Needles." *Id.* Needles was the driver of the car in which the currency was located. The money was to be used by Needles and his associates to purchase marijuana. Zatrapalek testified that he spoke with Izaguirre and "[s]ince the money was never claimed, they were going to invent a character ... to collect the money from the property room, utilizing Roy Rodriguez as the attorney." *Id.* at 7,873. There was sufficient evidence to prove that Needles was the owner of the money in the property room.

Izaguirre maintains that even if the money belonged to Needles, the evidence was insufficient to show a possessory interest in Mrs. Needles, the mother of the deceased. The indictment alleged that Mrs. Needles' civil rights were violated when the funds were released from police custody. Mrs. Needles testified that her son died intestate, was divorced and had no children. *Id.* at 7,021, 7,024. His estate was administered under Florida's summary probate procedure. *Id.* at 7,038. These facts were sufficient to prove at least an ownership interest in the mother.

Izaguirre makes the same arguments with respect to the charge alleging a deprivation of Armando Fiallo Jr.'s civil rights. The sum of $62,735.00 was taken from the possession of Armando Fiallo, Sr. and deposited in the police property room. *Id.* at 7,887, 7,896. Zatrapalek recounted that the reason for the raid on Fiallo's house was because Fiallo "had a large amount of money and cocaine ...." *Id.* at 7,887.[10]

---

**8.** 18 U.S.C. § 242 provides, in part:
 Whoever, under color of any law, statute, ordinance, regulation or custom, willfully subjects any inhabitant of any State, Territory or District to the deprivation of any rights, privileges or immunities secured or protected by the Constitution or laws of the United States ... shall be fined not more than $1,000.00 or imprisoned not more than one year, or both ....

**9.** In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit Court of Appeals adopted as precedent all decisions of Unit B of the former Fifth Circuit Court of Appeals.

**10.** Izaguirre contends that Fiallo denied he owned the money. In reality, Zatrapalek stated that, when the detectives asked him, Fiallo "refused to comment upon it." *Id.* at 7,892.

Derringer, on the other hand, stated that Carlos Fernandez, who later took the money from the property custodian, arrived during the raid and indicated that he was a relative of Fiallo's and was the rightful owner of the money. *Id.* at 12,617. Derringer's testimony was directly contradicted by Zatrapalek. According to Zatrapalek, Izaguirre approached him with a scheme to remove the funds. *Id.* at 8,042. Izaguirre proposed Fernandez as the logical choice because he could not be traced. *Id.* at 8,047. Both Fernandez' wife and Armando Fiallo, Jr. denied there was any relationship between Fernandez and Fiallo. *Id.* at 7,402, 7,729. Finally, Izaguirre admitted he had met Fernandez previously. *Id.* at 12,228. The resolution of the conflicting evidence was a credibility choice for the jury. *United States v. Baxter,* 733 F.2d 1443, 1445 (11th Cir.1984).

There was also ample evidence that Armando Fiallo, Jr. had an interest in his father's estate. He was the only child of Armando Fiallo, Sr., who died intestate. *Id.* at 7,729. Because Mrs. Needles and Armando Fiallo, Jr. possessed ownership interests in the funds expropriated by Izaguirre, "the victims were entitled to have the status of the seized property determined by due process." *United States v. McClean,* 528 F.2d 1250, 1255 (2d Cir. 1976).[11]

Finally, Izaguirre urges that he had no part in the theft from the property room of the currency seized from Roy Tateishi. Tateishi testified he made no attempt to secure the money and did not authorize Oscar Rodriguez to act in his behalf. Transcript at 6,079. There is evidence that Izaguirre signed the property release form. *Id.* at 7,963, 12,226. Moreover, Zatrapalek stated that the money was divided among him, Izaguirre, Derringer, Ojeda and Rodriguez. *Id.* at 7,952. Despite the evidence to the contrary, the jury was free to reject Izaguirre's version of the events.

**11.** Because we find that Mrs. Needles and Armando Fiallo, Jr. were in fact deprived of a property interest, it is unnecessary to address

## VI.

■ At the trial, defense counsel originally agreed among themselves to ask the district court for sixteen hours, or two hours each, for their final arguments to the jury. *Id.* at 13,595. The district court suggested that a total of four hours and fifty minutes would be sufficient. *Id.* at 13,139. In response, the appellants requested ten to twelve hours or an average of, at the most, ninety minutes each. *Id.* at 13,595. Finally, the district court allotted six hours and thirty minutes. *Id.* at 13,610–11. Derringer was granted one hour and twenty minutes. The district court denied his request for an additional forty minutes. The appellants contend that the district court unreasonably limited the extent of their closing argument. This is a matter within the sound discretion of the district court. *United States v. Roe,* 670 F.2d 956, 971 (11th Cir.), *cert. denied,* 459 U.S. 856, 103 S.Ct. 126, 74 L.Ed.2d 109 (1982).

■ The district court did not abuse its discretion in either fixing the time for closing arguments or rejecting Derringer's request. Derringer's total time for argument was only ten minutes less than his second request. He claims he was unable to address all of the charges against him, particularly the count alleging a deprivation of Fiallo's civil rights. Yet, the record shows that Derringer's attorney discussed this charge as well as the alleged role of Carlos Fernandez in this count. *Id.* at 14,-009–10. There is simply no indication that Derringer and the other defendants were adversely affected by the district court's ruling.

## VII.

■ During his closing argument, the prosecutor first told the jury: "You can prevent the corruption from spreading. You can convict on the evidence that you heard …." Transcript at 14,290. This statement allegedly constituted an impermissible appeal to the passion of the jury.

the government's contention that a non-owner still has some due process rights in the distribution of the property.

The test in this circuit for evaluating the prosecutor's comments is "(1) whether the remarks were improper and (2) whether they prejudicially affected substantive rights of the defendants." *United States v. Vera*, 701 F.2d 1349, 1361 (11th Cir. 1983). In *United States v. Kopituk*, 690 F.2d 1289, 1342–43 (11th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983), this court held that "[a]ppeals to the jury to act as the conscience of the community, unless designed to inflame the jury, are not per se impermissible." In that case, the prosecutor also urged the jury to halt the spread of corruption.[12] Even assuming the statements were improper, we, like the court in *Kopituk*, find that they did not prejudice the substantial rights of the defendants.

■■■ The prosecuting attorney next allegedly expressed his personal opinion as to the defendants' guilt by remarking that,

no one wants to believe that the man on the corner, the man in blue that you all looked up to as a kid, is no different than the thug in the alleyway that he was sworn to protect you from ...

Transcript at 14,288. Since there was no objection to this comment, we evaluate it under the plain error standard. *United States v. Rojas*, 731 F.2d 707, 710 (11th Cir.1984). In reviewing the prosecutor's closing argument for prejudice, we "may consider the district court's jury instruction and the strength of the evidence against each defendant." *United States v. Phillips*, 664 F.2d 971, 1031, (5th Cir.1981) (Unit B), *cert. denied sub nom. Meinster v. United States*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982) (*quoting United States v. Dorr*, 636 F.2d 117, 121 (5th Cir.1981)). Here, the district court instructed the jury that arguments were not evidence. Transcript at 14,311–12. In view of this instruction and the substantial evidence against the appellants, the comment did not constitute plain error.

■■■ Finally, the prosecutor stated to the jury that "we don't take pleasure in prosecuting these men, we don't relish convicting ...." Transcript at 14,289. Again assuming the remark to be improper, under the *Phillips* standard, it did not adversely affect the defendants' substantive rights. *See also Rojas*, 731 F.2d at 710.

### VIII.

Prior to the trial of this case, Tateishi had agreed to cooperate with the government when he was arrested for possession of cocaine with intent to distribute. He pleaded guilty and was given a suspended sentence and placed on probation. While on probation, Tateishi again was arrested on drug charges, which were still pending at the time he testified against the appellants.

On cross-examination, Tateishi was questioned about his later arrest in an effort to show his bias. Over the government's objections, the district court permitted an inquiry concerning the fact of his arrest and whether he had made a deal or expected any benefit from the government for his testimony. The district court, however, precluded any questions touching on the particular facts surrounding the arrest. Transcript at 6,169–70.

■■■ A criminal defendant's right to confront the witnesses against him and to reveal possible bias is basic to a fair trial. *McKinzy v. Wainwright*, 719 F.2d 1525,

---

**12.** The prosecutor in *Kopituk* told the jury:

[Y]ou ladies and gentlemen, representing the citizens of this community and the citizens of Southeastern United States by your verdict telling them that enough is enough. We ask you by your verdict, ladies and gentlemen, to help clean up Dodge Island. We ask you by your verdicts to help rid the ports of Jacksonville, Savannah and Charleston of people who by participating, directly and indirectly, in racketeering activity are corrupting our na-

tion's ports, who by misusing and utilizing their position of fiduciary responsibility on behalf of different companies are influencing and controlling and affecting the lives of people and everyone that works in these different cities.

By your verdict, ladies and gentlemen, we ask you to tell them enough is enough.

*Id.* at 1342. The single comment by the prosecutor here pales by comparison to the argument in *Kopituk*.

1528 (11th Cir.1983). This court recently held,

> where a prosecution witness has been threatened with a criminal charge or actually charged with a criminal offense, the defendant is entitled to explore those circumstances on cross-examination in order to bring to the jury's attention the witness' possible motive or self-interest with respect to the testimony given.

*United States v. Garrett*, 727 F.2d 1003, 1011 (11th Cir.1984). The right to cross-examine, however, is not unlimited. Once there is sufficient cross-examination to satisfy the confrontation clause of the sixth amendment, further questioning is within the district court's discretion. *Kopituk*, 690 F.2d at 1337.

 In this case, the defendants were permitted to explore any bias. Tateishi admitted he had serious criminal charges pending against him. In response to the defendants' questioning, Tateishi denied that he had made a deal with the government or that he expected any benefit for his testimony. We cannot say that an investigation of the circumstances surrounding the arrest itself would have exposed further bias or lessened Tateishi's credibility.

In *Kopituk, supra,* the district court permitted questioning designed to elicit whether the witness had reached an agreement with the government but precluded any inquiry as to the details of the murder conspiracy which resulted in the witness's conviction. This court found no reversible error.

> The critical point, which the trial court correctly permitted to be brought out before the jury, was that [the witness] had arrived at an agreement with the government whereby he would testify in

the instant matter in return for a lenient plea arrangement in connection with his state charges.

*Kopituk*, 690 F.2d at 1337. The same is true in this case. The jury knew that Tateishi earlier had agreed to cooperate with the government, that he had subsequently been arrested, and that he expected no benefit from his testimony here. The district court did not abuse its discretion in limiting further cross-examination.[13]

### IX.

 The appellants also sought to question Zatrapalek about criminal acts allegedly committed by him before his transfer to the homicide section. The district court precluded such inquiries under the authority of Fed.R.Evid. 608(b).

That Zatrapalek had long been involved in criminal activities, the appellants contend, was important to their defense to the RICO charges. Zatrapalek himself, not the homicide section, allegedly was the criminal enterprise. The district court correctly noted, however,

> [e]ven if he was heavily involved ... in criminal activity before he got into Homicide, I don't really see how that proves that there wasn't a conspiracy after he arrived in Homicide ....

Transcript at 8,581. Any prior illegal conduct by Zatrapalek would not preclude the existence of a conspiracy within the homicide section. The mere possibility that further examination might be helpful to their defense does not give the defendants any greater right of cross-examination than that afforded by the Federal Rules of Evidence.

 Another reason advanced by the appellants to support the additional cross-examination was the need to rebut Zatrapa-

---

**13.** We also note that Fed.R.Evid. 608(b) prohibits the use of extrinsic evidence to show specific instances of bad conduct to attack the credibility of a witness.

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may,

however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

lek's statement during direct examination that he had not been involved in certain criminal activities prior to his transfer to the homicide section. Even if we assume the district court erred in limiting further questioning, it does not require reversal. To constitute an abuse of discretion, "appellants must show that the restrictions imposed upon their cross-examination were clearly prejudicial." *United States v. Elliott,* 571 F.2d 880, 909 (5th Cir.), *cert. denied, sub nom Hawkins v. United States,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978) (*quoting Gordon v. United States,* 438 F.2d 858, 865 (5th Cir. 1971)).

 No such prejudice has been shown in this case. Zatrapalek was extensively cross-examined over almost two and one-half days. He admitted to participation in a number of criminal activities. In fact, Zatrapalek stated he had committed perjury in a federal court. Transcript at 8,807. In light of the damage to his character elicited during cross-examination, any further admissions of criminal misconduct would not have added to his discredit. Any error, if any, was harmless.

### X.

 Ojeda sought to introduce evidence of alleged conflicts between the homicide section and the FBI. The evidence suppos-

edly related to his state of mind. Because of the bad feelings that resulted from this conflict, he says that he never would have formed a close relationship with Escandar, a known FBI informant.

The district court correctly excluded evidence of any past problems between federal and local authorities as irrelevant. Ojeda does not dispute that he participated in many of the conspiracies and crimes charged in the indictment. The evidence, especially the testimony of Escandar and Zatrapalek, refutes any notion that Ojeda did not trust Escandar. Casting aspersions upon the government, without more, hardly constitutes a defense.

### XI.

On September 12, 1982, after deliberating for four days, and reaching verdicts on three defendants, the jury informed the district court that "after a conscientious effort, we have not been able to arrive at a unanimous decision concerning the majority of the Defendants. We will await your instruction." Transcript at 14,508. The district court then reread a portion of the instructions to the jury. Three days later, on September 15, 1982, without any further indication of a deadlock, the district court gave a modified *Allen*[14] charge over the defendants' objections.[15] The jury reached

14. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

15. Transcript at 14,583–86:

THE COURT: Now, ladies and gentlemen, I know that you jurors are attempting to discharge your responsibilities in a conscientious manner. I stand ready at any time, if you request it, to charge you additionally on the law. I have made the charge on the law in this case as simple as the applicable law will permit me to do it. You have been deliberating now for more than 40 hours over about six days. On Sunday, the fourth day of deliberations, at 11:10 A.M., you informed us that you had decided the charges against the two of the three Defendants whose verdicts have now been published. At 3:12 P.M. on Sunday, you informed the Court, quoting from the foreman's note, "Your Honor, after conscientious effort, we have not been able to arrive at a unanimous decision concerning the majori-

ty of the Defendants. We will await your further instruction."

We, in response, reiterated an earlier instruction, and I charge you additionally at this time. I am going to ask that you continue your deliberation in an effort to agree upon verdicts, and dispose of this case, and I have a few additional comments I would like for you to consider as you do so.

This is an important case. The trial has been expensive in time, effort, and money to both the Defense, and the Prosecution. If you should fail to agree on verdicts, the case is left open, and must be tried again. Obviously, another trial would only serve to increase the cost to both sides, and there is no reason to believe that the case can be tried again by either side better, or more exhaustively than it is tried before you. Any future jury must be selected in the same manner, from the same source you were chosen, and there is no reason to believe that the case could ever be

verdicts as to Alonso and Izaguirre on September 20, 1982, Ojeda on September 21, 1982, and Derringer on September 23, 1982.

The appellants urge that an *Allen* charge was not necessary or warranted because the jury had not suggested any further impasse after the district court re-read a portion of its earlier jury instructions. The timing of an *Allen* charge is within the trial court's discretion. *United States v. Scruggs*, 583 F.2d 238, 241 (5th Cir.1978). In *Scruggs*, the district court also gave an *Allen* charge *sua sponte*. That was not reversible error, however, the court held, because "[w]e have never required the trial judge to wait for requests from counsel or from the jury before giving the charge." *Id.* The jury here had been deliberating for a week and had earlier indicated some difficulties in reaching verdicts on all the defendants. There was no abuse of discretion in waiting until three days later to give the *Allen* charge.

The appellants also take issue with the content of the charge. They contend it coerced the jury into reaching a verdict

> submitted to 12 men or women more conscientious, more impartial, or more competent to decide it, or more or clearer evidence could be produced.
>
> If a substantial majority of your number are for a conviction, each dissenting juror ought to consider whether a doubt in his or her mind is a reasonable one, since it appears to make no effective impression upon the minds of the others. On the other hand, if a majority or lesser number of you are for acquittal, the other jurors ought seriously ask themselves again, and most thoughtfully, whether they do not have a reason to doubt the correctness of a judgment which is not shared by several of their fellow jurors, and whether they should distrust the weight, and sufficiency of the evidence which fails to convince several of their fellow jurors beyond a reasonable doubt.
>
> Under these instructions, there are several charges against multiple Defendants in the indictment. You may find one or more of the accused guilty or not guilty as charged in the indictment. Similarly, you may find an accused guilty or not guilty of one or more of the several charges against him. This is true even though some of the charges are related to one another. Your verdicts must, of course, be consistent with the principles of law related to you in all the instructions given to you by this Court.

without adequate deliberation. The district court primarily followed the Fifth Circuit Pattern Jury Instructions but inserted the following language:

> Under these instructions, there are several charges against multiple defendants in the indictment. You may find one or more of the accused guilty or not guilty as charged in the indictment. Similarly, you may find an accused guilty or not guilty of one or more of the several charges against him. This is true even though some of the charges are related to one another. Your verdicts must of course, be consistent with the principles of law related to you in all the instructions given to you by this court.

Transcript at 14,585–86. The district court based this part of the charge on *United States v. Sawyers*, 423 F.2d 1335 (4th Cir. 1970).

Although much criticized,[16] the pattern *Allen* charge routinely has been upheld by the appellate courts. *United States v. Cheramie*, 520 F.2d 325, 330 (5th Cir.1975).

> Remember at all times that no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of the evidence, but remember also that after full deliberation, and consideration of the evidence in the case, it is your duty to agree upon a verdict if you can do so without surrendering your conscientious conviction.
>
> You must also remember that if the evidence in the case fails to establish guilt beyond a reasonable doubt, the accused should have the unanimous verdict of not guilty.
>
> You may be as leisurely in your deliberations as the occasion may require, and should take all of the time which you may feel is necessary.
>
> I will ask you now that you retire once again, and continue your deliberations with these additional comments in mind to be applied, of course, in conjunction with all of the instructions I have previously given to you. Ladies and gentlemen, you may retire.

16. *See e.g. United States v. Amaya*, 509 F.2d 8 (5th Cir.1975), *cert. denied sub nom. Flores-Amaya v. United States*, 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977); *United States v. Bailey*, 480 F.2d 518, 519 (5th Cir.1973) (en banc) (Goldberg, J., concurring in part and dissenting in part); *Thaggard v. United States*, 354 F.2d 735, 740 (5th Cir.1965) (Coleman, J., specially concurring).

Nonetheless, because of its potential coercive effect, close scrutiny is demanded of any modification of the accepted language. In making this determination, "the court looks 'to the language employed and that language's impact, under the circumstances, on the finders of facts.'" *United States v. Blevinal,* 607 F.2d 1124, 1127 (5th Cir.1979), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980) (*quoting United States v. Cheramie,* 520 F.2d 325, 329 n. 3 (5th Cir.1975)).

■ After a thorough examination of the course of the jury's deliberations, as well as the content of the instructions as a whole, we fail to find any coercive impact. The earliest verdicts after the court gave the challenged charge were reached five days later. The jury did not formulate its judgment in Derringer's case until over a week after the *Allen* charge was read to it. In fact, the jury was unable to reach a verdict on all the charges against Derringer, further undermining the assertion that the jury was unduly influenced into reaching a verdict. *See United States v. Foster,* 711 F.2d 871, 884 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984).[17] This does not mean that we uniformly approve of departures from the standard *Allen* charge, nor do we express any opinion on the use of such additional language in other cases. We merely hold that, under these facts, there was no coercion of the jury in this case.

The judgments of convictions are AFFIRMED.

---

17. The appellants attempt to explain away the jury's failure to agree on Derringer's verdict by stating that "the jury was not told [it] could fail to agree until [it was] at an absolute impasse on that last defendant ...." Ojeda's Reply Brief at

9. Such an argument makes little sense. The fact that the jury reached an impasse is proof that it was aware of its inability to agree without any prompting by the district court.