**UNITED STATES, Plaintiffs,**

v.

**James COSTELLO and Wayne Olson, Defendants.**

**No. 83 CR 978.**

United States District Court, N.D. Illinois, W.D.

June 10, 1985.

Dan Reidy, U.S. Attorney's Office, Chicago, Ill., for plaintiffs.

Sam Adam, Edward M. Genson, Jeffrey B. Steinback, Thomas A. Corfman, Chicago, Ill., for Olson.

Kenneth Cunniff, Chicago, Ill., for Costello.

## ORDER

ROSZKOWSKI, District Judge.

Before the court are defendants, Wayne W. Olson's and James J. Costello's, joint motion to suppress the government's Title III surveillance, and defendant, James J. Costello's, motion for relief with respect to certain consensual recordings. As set forth in this court's August 31, 1984 order, the instant fifty-five count indictment charges the defendants with violations of the mail fraud statute, 18 U.S.C. § 1341 (1982), the Hobbs Act, 18 U.S.C. § 1951 (1982), and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) (1982). For the reasons set forth herein, the defendants' motions are denied.

## I. BACKGROUND

The instant indictment arose from a joint state and federal investigation of judicial corruption in the Chicago metropolitan area. On November 26, 1980, the United States Attorney applied for authorization to intercept the oral communications of Judge Wayne Olson, Attorney James J. Costello, another named attorney and "others as yet unknown" occurring in the judge's chambers at Branch 57 of the Circuit Court of Cook County, Illinois. The application sought to intercept communications concerning the solicitation and pay-

ment of bribes to influence the referral of, outcome of and eventual disposition of, criminal cases pending before Judge Olson.

The sole affidavit supplied in support of the application for the Title III surveillance was executed by Randall L. Jordan, a Special Agent with the Federal Bureau of Investigation. For the two and one-half years preceding the application, Jordan had been primarily assigned to the investigation of the judiciary in the Chicago metropolitan area (code named operation "Greylord"). The information provided in Jordan's affidavit was derived from three principal sources: (1) Jordan's general experience as an F.B.I. agent, (2) consensual recordings and observations provided by Terry Hake, an undercover agent posing as an Assistant Cook County State's Attorney assigned to Judge Olson's courtroom, and (3) information provided by a Confidential Source, an attorney who had practiced in the criminal courts of Cook County for many years.

On the same day the application was made, former Chief Judge James Parsons issued an order authorizing the surveillance for a period of thirty days. The surveillance commenced on December 1, 1980. On December 19, 1980, the government requested and was granted a thirty day extension. On January 20, 1981, the surveillance was discontinued.

Defendants jointly move to suppress the Title III surveillance contending: (1) the November 26, 1980 authorization was invalid because it was unsupported by probable cause; (2) the November 26, 1980 authorization was invalid because it was based upon false information which Agent Jordan knew was false, or, at the very least, presented with reckless disregard for its truth or falsity; (3) the November 26, 1980 authorization was invalid because the government failed to adequately explain the necessity for electronic surveillance; (4) the November 26, 1980 and December 19, 1980 authorizations were invalid because they were overly broad and the conduct of the surveillance was too intrusive; and (5) the December 19, 1980 application was in-

valid because it was based upon illegally obtained evidence and the intentional misrepresentation of a material fact. In addition, defendant, Costello, moves to quash the consensual recordings of his conversations with Terry Hake on the grounds that the scope and duration of those recordings violated the Fourth Amendment, and moves to bar Hake from testifying on the grounds that Hake's testimony would violate his attorney-client privilege.

On April 25 and 26, 1985, this court heard testimony concerning the adequacy of the measures taken by the government with respect to minimization. On April 29, 1985 the court heard oral arguments on the issues of minimization, the necessity for electronic surveillance and the need to hold a *Franks* hearing. No further briefing was deemed necessary.

## II. DISCUSSION

### A. Probable Cause for the November 26, 1980 Authorization

Even assuming the allegations set forth in Agent Jordan's original affidavit are true, defendants initially contend there was no probable cause for the November 26, 1980 authorization. Specifically, defendants contend Costello's consensually recorded remarks were mere "rainmaking", manifestly unreliable and not adequately corroborated by the remaining facts set forth in Jordan's affidavit. Moreover, defendants contend the information supplied by the government's Confidential Source was stale. Finally, the defendants contend the Confidential Source's reliability was not adequately demonstrated by Jordan's affidavit.

In examining an affidavit to determine whether or not the issuing court had probable cause to issue a warrant or authorize the interception of oral communications, this court does not make a *de novo* probable cause determination. *See Massachusetts v. Upton,* — U.S. —, 104 S.Ct. 2085, 2088, 80 L.Ed.2d 721 (1984) (The making of a *de novo* determination "is inconsistent both with the desire to encourage

use of the warrant process by police officers and with the recognition that once a warrant has been obtained, intrusion on interests protected by the Fourth Amendment is less severe than otherwise may be the case."); *see also United States v. Ramirez*, 602 F.Supp. 783, 789 (S.D.N.Y.1985) (A Court "must give substantial deference to a prior judicial determination that probable cause existed ... and should resolve any doubts as to the existence of probable cause in favor of upholding the authorization.") Instead, the task of this court is to determine whether or not there was a "substantial basis" for Judge Parsons' finding of probable cause. *Id.* In testing the existence of probable cause, this court must examine the affidavit submitted in support of the government's application for electronic survelliance as a whole, in a realistic and non-technical manner. *United States v. Dorfman*, 542 F.Supp. 345, 360 (N.D.Ill. 1982) *aff'd. sub nom. United States v. Williams*, 737 F.2d 594 (7th Cir.1984).

■ Viewing Agent Jordan's affidavit in light of the considerations set forth above, this court finds that former Chief Judge Parsons had a more than adequate basis for determining that probable cause existed to initiate a Title III search. Jordan's lengthy affidavit devoted twenty-three pages to the facts and circumstances upon which probable cause was believed to exist. It is unnecessary to recite all of the facts set forth in Jordan's affidavit. A relatively brief overview, however, is instructive.

Jordan's affidavit begins by reciting the activities of James Costello, a criminal defense attorney regularly practicing in Judge Olson's courtroom. Costello unknowingly provided Terry Hake with a detailed description of corrupt activities in Judge Olson's Courtroom. Specifically, on at least sixteen occasions, Costello admitted to having bribed Judge Olson in return for case referrals and favorable dispositions of cases.[1] In addition, on numerous other occasions, Costello identified other attorneys who he indicated were also bribing Judge Olson.[2]

Jordan's affidavit also sets forth the observations of an undisclosed Confidential Source, an attorney practicing for many years in the Cook County criminal courts. (¶ 35) In October, 1975, the Confidential Source told the F.B.I. that on three separate occasions he had paid a total of $2,500 to Judge Olson's clerk in order to secure favorable dispositions on cases that he had pending before Judge Olson; on each occasion, the Confidential Source indicated Judge Olson did, in fact, render favorable treatment to his clients. (¶ 36) On May 21, 1980, the Confidential Source told Agent Jordan that other defense attorneys had informed him that Judge Olson was still accepting bribes in return for favorable treatment in Branch 57. (¶ 37) If a lawyer was not known to Judge Olson, the Confidential Source was told the lawyer could go to the Judge's clerk. On June 18, 1980, the Confidential Source advised Jordan that he had recently had a conversation with Judge Olson's former clerk, the one he had paid in 1975. (¶ 380 The Confidential Source asked Judge Olson's former

---

1. Jordan's affidavit discloses the following conversations between James Costello (JC) and Terry Hake (TH) in which JC admitted bribing Judge Olson (JO): ¶ 13—7/28/80; ¶ 14—7/29/80 (JC tells TH that he paid JO $200 that day); ¶ 15—7/31/80; ¶ 16—8/6/80 (JC tells TH he paid JO $500 last week); ¶ 17—8/7/80 (JC tells TH that on one occasion he had recently paid JO $300); ¶ 18—8/25/80; ¶ 19—8/27/80 (JC tells TH he paid JO $580 on 8/26/80 and $675 that day; ¶ 20—8/29/80; ¶ 21—9/9/80 (JC tells TH he paid JO $400 on that day); ¶ 23—9/12/80 (JC tells TH he paid JO $500 on that day); ¶ 28—9/19/80 (JC tells JO $750 on that day); ¶ 29—9/22/80 (JC told TH he had to pay JO $250); ¶ 30—9/23/80 (JC told TH he paid JO $750 on 9/19/80); ¶ 31—9/24/80 (JC tells TH he paid JO $200; ¶ 32—9/25/80 (JC again tells TH how he paid JO $200 on 9/24/80); ¶ 33—9/26/80 (JC tells TH that he paid JO $800 that day and a total of $1,000 that week); ¶ 53j—10/31/80 (JC tells TH he paid JO $1,000 that day). Thus, JC was consistent in telling TH about the amounts he paid to JO. *See* ¶¶ 28 and 30 (On 9/19 and 9/23 JC told TH he paid JO $750 on 9/19), and 31 and 33 (on 9/24 JC tells TH he paid JO $200 and on 9/26 JC tells TH he paid JO $800 and a total of $1,000 for the week).

2. *See* Jordan Affidavit, ¶¶ 13, 45, 46, and 48.

clerk who an attorney should see about making a bribe in a case pending before Judge Olson. Judge Olson's former clerk allegedly told the Confidential Source to "see [him] first" because he was still very close to Judge Olson. Finally, on September 15, 1980, based upon information received from other defense lawyers, the Confidential Source informed Jordan that Judge Olson no longer had a regular "bagman" and was accepting bribes directly from defense lawyers. (¶ 39)

Apart from the information provided by Costello and the Confidential Source, the affidavit contains Hake's own direct observations. On June 3, 1980, Hake observed an attorney attempting to give money to Judge Olson's clerk; the clerk noticed that Hake had seen the offer and declined the money at that time. (¶ 43) Hake was also able to observe Costello entering and exiting Judge Olson's chambers, able to observe Judge Olson actually referring cases to Costello, and, on numerous occasions, was himself actually the recipient of Costello's bribes.[3]

In addition, Hake was able to observe the actions of numerous other attorneys, which, in light of the other facts known to him, were consistent with criminal behavior. For example, Hake was informed by two police officers that one attorney, Attorney # 10,[4] attempted to bribe them in a particular case. (¶ 46) Despite the officers' refusal to accept the bribe, the attorney's motion to suppress was granted by Judge Olson. (*Id.*) Costello later informed Hake that Judge Olson had received the money the police officers refused. (*Id.*) Subsequently, Judge Olson called Hake into his chambers on two occasions to discuss Hake's intentions with respect to an appeal. (¶ 47) Costello advised Hake that Judge Olson was worried about an appeal

and that the defense attorney handling the case was willing to pay Hake $100 not to appeal (¶ 48); Hake eventually accepted the bribe and the bribe was subsequently acknowledged by Attorney # 10. (¶¶ 51 and 52)

Finally, Jordan's sources corroborated one another's information with respect to numerous details. For example, the Confidential Source's information coincided with the information provided by Costello concerning the way in which he originally began bribing Judge Olson; Costello told Hake that he began bribing Judge Olson by approaching Judge Olson's clerk (who's first name corresponded with that given by the Confidential Source) and asking him to give money to the Judge. (¶ 17) Moreover, the Confidential Source's information concerning the transfer of Judge Olson's clerk and Judge Olson's subsequent direct acceptance of bribes was corroborated by Costello. On August 8, 1980, Costello told Hake that about two months earlier Judge Olson's clerk was transferred out of Branch 57; after the transfer, Costello told Hake he went directly to Judge Olson to make his payments. (¶ 17)

In addition, Jordan's sources' information was corroborated by one another with respect to other details. For example, the Confidential Source identified another defense attorney, Attorney # 2, as the individual who introduced him to the system of fixing cases and as one of several attorneys who were bribing Judge Olson in 1975. (¶ 36) In April, 1980, Hake was informed by the assistant state's attorney preceding him at Branch 57 that, on a day that Judge Olson was not presiding at Branch 57, Attorney # 2 had offered to split the bond money on one of his client's cases if the assistant state's attorney would dismiss the case; the assistant

---

**3.** *See* Jordan Affidavit: ¶ 12—7/25/80 (JC pays TH $100); ¶ 13—7/28/80; ¶ 14—7/29/80 (JC pays TH $100); ¶ 15—7/32/80 (JC pays TH $50); ¶ 22—9/10/80 (JC pays TH $150); ¶ 24—9/15/80 (JC pays TH $100); ¶ 25—9/16/80; ¶ 26—9/17/80 (JC pays TH $50); ¶ 27—9/18/80 (JC pays TH $60); ¶ 28—9/19/80; and ¶ 31—9/24/80 (JC pays TH $50).

**4.** In addition to the Confidential Source and Costello, there are thirteen defense attorneys mentioned in the affidavit as having engaged in activities with Judge Olson. Many of these individuals have not been indicted. In order to maintain their anonymity, they will be referred to in the order that they first appeared in Jordan's affidavit.

state's attorney informed Hake that the offer surprised him because Attorney # 2 regularly practiced before Judge Olson and seemed to do well when Judge Olson was presiding. (¶ 42) In addition, Hake observed that Attorney # 2 frequented Branch 57 and had seen the attorney with Judge Olson in his chambers. (¶ 53). Finally, Costello informed Hake that Attorney # 2 bribed him for cooperative testimony when Costello was a police officer and strongly inferred that Attorney # 2 was presently bribing Judge Olson. (¶ 45)

Taken as a whole, this court concludes that the information described above, in addition to the other information set forth in Jordan's affidavit, provided Judge Parsons with a more than adequate basis for determining there was probable cause to believe illegal payments were taking place in Judge Olson's chambers at Branch 57. The defendants contend, however, that the information provided in the affidavit was insufficient to warrant a finding of probable cause. As noted previously, defendants contend Costello's statements constituted manifestly unreliable "rainmaking" aimed at intimidating or demoralizing Hake, that the Confidential Source's information was stale, and that the facts contained in Jordan's affidavit regarding the Confidential Source's "track record" were insufficient to demonstrate his credibility.

■ This court is unpersuaded by the defendants' contention that Judge Parsons was bound to conclude Costello's statements constituted manifestly unreliable "rainmaking". In support of their position, defendants urge this court to apply the two prong test set forth in *Spinelli v. United States*, 393 U.S. 410, 412–13, 89 S.Ct. 584, 586–87, 21 L.Ed.2d 637 (1969) and *Aguilar v. State of Texas*, 378 U.S. 108, 114–15, 84

S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964); those decisions require an affidavit based upon information provided by someone other than the affiant to set forth facts demonstrating: (1) the basis of the hearsay declarant's knowledge concerning the subject criminal activity and (2) the veracity, credibility and reliability of the declarant. *Id.*

The separate two prong test set forth in *Spinelli* and *Aguilar*, however, no longer controls. In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court held that while "an informant's 'veracity', 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report ... these elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case." 103 S.Ct. at 2327–28. Rather, the Court recognized that a totality of the circumstances approach was proper "where a deficiency in one [of the these elements] may be compensated for, in determining the overall reliability of the tip, by a strong showing as to the other, or by some other indicia of reliability". 103 S.Ct. at 2329.[5]

Whether applying *Spinelli* and *Aguilar* or *Gates* to the facts of the present case, this court finds Costello's statements to Hake were not manifestly unreliable "rainmaking". Whether considered as a separate factor or simply as a relevant consideration, there cannot be any genuine disagreement that Costello's remarks demonstrated a basis of knowledge concerning the subject of the Title III surveillance. Costello admitted to having *directly bribed Judge Olson*. Thus, he certainly had a basis of knowledge regarding the nature and scope of the asserted corruption. The

---

**5.** Defendants contend that *Gates* should not be retroactive because "[t]o award the government with *Gates* ... would only encourage other investigative officers to disregard existing constitutional rights by creating the false hope that investigative conduct violative of the Constitution may receive imprimatur at a later date." Both the Eighth and Ninth Circuits have expressly held that *Gates* in retroactive, however, *United States v. Little*, 735 F.2d 1049, 1054 (8th

Cir.1984) and *United States v. Estrada*, 733 F.2d 683, 685 (9th Cir.1984), and the Supreme Court and Seventh Circuit have applied *Gates* retroactively without expressly deciding that issue. *Massachusetts v. Upton*, — U.S. —, 104 S.Ct. 2085, 2088, 80 L.Ed.2d 721 (1984); *United States v. Pritchard*, 745 F.2d 1112, 1120 (7th Cir.1984). Thus, this court holds that *Gates* provides the applicable standard here.

only real issue, therefore, is Costello's credibility and the reliability of his statements.

In the view of this court, the reliability of Costello's statements is adequately established in the affidavit. First, Costello's numerous detailed statements tend to make his information reliable. *United States v. Unger,* 469 F.2d 1283, 1286–87 (7th Cir. 1972) *cert. denied,* 411 U.S. 920, 93 S.Ct. 1546, 36 L.Ed.2d 313 (1973) and *United States v. Roman,* 451 F.2d 579, 581 (4th Cir.1971) *cert. denied* 405 U.S. 963, 92 S.Ct. 1171, 31 L.Ed.2d 239 (1972). *See also Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 2329–30, 76 L.Ed.2d 527 (1983) ("even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first hand entitles his tip to greater weight than might otherwise be the case.") In the present case, Costello provided the history and details of his illegal relationship with Judge Olson, the times, places and amounts of his various bribes, and even attributed specific quotes and remarks to Judge Olson.[6] Thus, the content of his remarks alone strengthen his credibility and the reliability of his information.

Second, the fact that many of Costello's statements were directly against his penal interest added to his credibility. *United States v. Harris,* 403 U.S. 573, 583–85, 91 S.Ct. 2075, 2081–82, 29 L.Ed.2d 723 (1971) Despite the defendants' contention to the contrary, the fact that Costello was unaware that he was making the statements to an undercover agent does not alter the penal nature of his remarks. *United States v. Lang,* 589 F.2d 92, 97 (2nd Cir. 1978) Thus, the nature of Costello's statements and the circumstances under which he made the statements further support their reliability.

Third, as has been noted previously, many of Costello's statements were corroborated by the Confidential Source's information and Hake's observations. Costello's description of the formation of his corrupt relationship with Judge Olson corresponded to the Confidential Source's description of Judge Olson's method of operation. Similarly, Hake's observations concerning Costello's contact with Judge Olson and receipt of referrals corroborated Costello's remarks.

Finally, the mere fact that the defendants can construct an "innocent" explanation for many of Costello's remarks does not prohibit a finding of probable cause. *United States v. Anton,* 633 F.2d 1252, 1254 (7th Cir.1980); *see also United States v. Dorfman,* 542 F.Supp. 345, 359 (N.D.Ill. 1982) *aff'd. Sub. nom. United States v. Williams,* 737 F.2d 594 (7th Cir.1984) ("Even if there is an innocent explanation, as long as there is a reasonable probability that there is criminal activity afoot ... probable cause is present.") While the *possibility* existed that Costello's statements to Hake consisted of "mere rainmaking", this court cannot conclude Judge Parsons was required to adopt such an innocent construction. The defendants' contention that Costello's statements were manifestly unreliable is, therefore, rejected.

Similarly, this court rejects the notion that the Confidential Source's information was stale. The material information provided by the Confidential Source was provided in May, June and September of 1980. The information provided from 1975 was of very limited importance.

---

**6.** *See e.g.* Jordan Affidavit: ¶ 16—8/6/80 (JC informed TH that he had "cut a business deal" with JO in which the parties had agreed to split the bond money 50/50 on all cases that JO referred to JC as well as to split all of the inventoried money seized by the police which JC received as legal fees. In addition, JC told TH that the parties had agreed to meet every Friday to settle accounts to prevent JC from coming to JO's chambers so frequently); ¶ 17— 8/17/80 (JC tells TH how he began bribing JO through his clerk and, after the clerk was transferred, began bribing JO directly); ¶ 28— 9/19/80 (JC tells TH he paid JO in his chambers at approximately 2:15 p.m. that day); ¶ 32—9/25/80 (JC tells TH what JO said after JC gave him $200 during a chance encounter in a restaurant); and ¶ 53j—10/31/80 (JC shows TH a white envelope he had prepared for JO purportedly containing $1,000).

■ And finally, this court rejects the defendants' contention that the Confidential Source's reliability was not adequately shown. Jordan's affidavit disclosed that the Confidential Source had provided information to the F.B.I. on twenty occasions, that the information he provided had been corroborated on at least eight occasions by tape recorded conversations, that other information had been corroborated by independent investigations or other reliable sources, and that his information had never been found to be erroneous or inaccurate. Moreover, as was previously noted, much of the information he provided was "cross corroborated" in the affidavit by Costello and Hake. *United States v. Fina*, 405 F.Supp. 267, 271 (E.D.Pa.1975). Under the totality of the circumstances approach adopted in *Gates*, this information was adequate to establish the reliability of the Confidential Source.

In sum, examining the affidavit as a whole and affording Judge Parsons the deference due to him under the case law, this court cannot conclude his determination that probable cause existed to issue the Title III authorization was erroneous. Jordan's affidavit provided Judge Parsons with adequate information to make a determination concerning probable cause. Under these circumstances, this court cannot hold that decision was improper.

**B. The Need for a Franks Hearing with Respect to the November 26, 1980 Application**

In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that:

> ... Where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the alleged false statement is necessary to the finding of probable cause, the Fourth Amendment, requires that a hearing be held at the

defendant's request. *Id.* at 155–56, 98 S.Ct. at 2676.

Consistent with these requirements, the Court made clear that an affidavit supporting an application for a search warrant is presumed to be valid. *Id.* at 171, 98 S.Ct. at 2684.

■ In order to overcome *Franks'* presumption of validity and make the requisite preliminary showing, a defendant must provide *substantial evidence* that the affiant knew his allegations to be false, that he actually entertained substantial doubts as to the truth of the information, or that he had obvious reasons to doubt its veracity. *United States v. Reed*, 726 F.2d 339, 342 (7th Cir.1984) Moreover, a mere assertion that a *Franks* violation has occurred is not enough; competent evidence, not self serving statements, is required. *Untied States v. Barrienta*, No. 84–147 (7th Cir. March 28, 1985), Slip. op. at 12–13; *United States v. Askins*, 351 F.Supp. 408, 413 (D.Md.1972) Finally, mere mistakes are not necessarily evidence of knowing, intentional or reckless conduct. *United States v. Dorfman*, 542 F.Supp. 345, 369 (N.D.Ill.1982) *aff'd sub. nom., United States v. Williams*, 737 F.2d 594 (7th Cir.1984).

■ While the Supreme Court's decision in *Franks* dealt only with affirmative misrepresentations, *Franks* has been logically extended to material omissions as well. *Id.* at 367–70 *aff'd sub. nom.* 737 F.2d at 604. In order for an omission to be material, the defendant must prove that if the fact were included in the affidavit, the affidavit would not support a finding of probable cause. *Id. Franks* requirement of knowing, intentional or reckless conduct is also present. *Id.; United States v. Martin*, 615 F.2d 318, 329 (5th Cir.1980)

In the instant case, defendants cite numerous misrepresentations and omissions which they contend either were, or would have been, material to Judge Parsons in deciding upon the question of probable cause.[7] Defendants cite two specific mis-

---

**7.** Several additional misrepresentations and omissions cited by the defendants relate specifically to the necessity of undertaking electronic surveillance; they do not relate to the question

representations: (1) the statement in ¶ 21 that on September 9, 1980 Costello had paid $400 to Judge Olson in the Judge's chambers at Branch 57, and (2) the statement in ¶ 36, attributed to the government's Confidential Source, that in approximately 1974 Judge Olson began hearing gambling cases and that gambling cases could be "fixed" in Judge Olson's court. Defendants also assert the existence of several material omissions including: (1) the omission of any reference to a serious public fight occuring between Costello and Judge Olson on October 30, 1980, (2) the omission of numerous additional "rainmaking" statements by Costello which would have undercut his credibility, (3) the omission of the fact that Costello was intoxicated on many of the occasions he spoke to Hake, and (4) the omission of the fact that Hake coerced a criminal defendant into hiring Costello.

### 1. The Statement Contained in Paragraph 21

■ Defendants point out that the transcript of the September 9, 1980 conversation between Hake and Costello does not support the statement in ¶ 21 that Costello bribed Judge Olson in the Judge's chambers. Moreover, defendants contend the transcript of that conversation reveals that all future payments between Costello and Judge Olson were going to take place at a restaurant (Jean's) rather than in the Judge's chambers. Indeed, in their memorandum in opposition to the defendants' motion, the government admits:

> This transcript indicates that Olson wanted Costello to pay him at Jean's on Fridays. It also indicates that Costello disagreed with that arrangement and would 'rather go back there [chambers].' This transcript confirms that past payments took place in chambers *and establishes some uncertainty as to where future payments will take place. Id.* at 54–55 (emphasis added)

In the view of this court, the alleged misrepresentation in paragraph twenty-one

was not material to the finding of probable cause. Even without the "misrepresentation" in ¶ 21, there were numerous examples of bribes to Judge Olson in chambers reported to Hake by Costello. Thus, the inclusion of one additional incident was not dispositive.

Moreover, the substitution of the accurate information concerning the site of future payments would not have prevented the authorization from being issued. Even if paragraph twenty-one would have accurately reflected Hake and Costello's actual conversation, this court has no doubt the authorization would still have been issued. As the government points out, the transcript substantiates that past payments occurred in chambers; in addition, the remainder of the affidavit reflects at least four subsequent payments by Costello to Judge Olson in Chambers after September 9, 1980. (¶¶ 23, 28, 30 and 33) Thus, there is no reason to believe the "misrepresentation" or "omission" contained in ¶ 21 affected Judge Parsons' ruling.

Finally, the defendants have not made a substantial preliminary showing that Jordan's "misrepresentation" of the September 9, 1980 conversation between Hake and Costello was done knowingly and intentionally, or with reckless disregard for the truth. Although the September 9, 1980 conversation was inaccurately described in the affidavit, an accurate transcript of the conversation was attached as an appendix to the affidavit. If Jordan had intended to misrepresent the facts surrounding that conversation to Judge Parsons, it is highly unlikely that he would have attached an accurate transcript of the conversation. Thus, this court cannot find the statements contained in, or omitted from, paragraph twenty-one aid the defendants in making the substantial preliminary showing necessary to warrant a *Franks* hearing.

### 2. The Statement Contained in Paragraph 36

■ Paragraph thirty-six quotes the government's Confidential Source as stat-

---

of probable cause. The discussion of the alleged misrepresentations and omissions relating

to the necessity of the authorization will be reserved until that section of this opinion.

ing, "that in approximately 1974, Judge Wayne W. Olson began hearing gambling cases." The affidavit then goes on to explain that the Confidential Source paid Judge Olson's clerk and, as a result, that Judge Olson "gave favorable treatment to [the] Confidential Source's clients." During oral arguments, however, the defendants indicated that they could show Judge Olson never sat in gambling court.

As has been noted previously, the burden of establishing that a substantial basis exists for holding a *Franks* hearing rests upon the defendant; that burden cannot be satisfied by mere self-serving statements. *United States v. Reed*, 726 F.2d 339, 342 (7th Cir.1984) Here, the defendants have failed to provide any evidence that Judge Olson did not sit in gambling court. Thus, the defendants' mere assertion that the statement to the contrary in Agent Jordan's affidavit was false cannot form the basis for a *Franks* hearing.

Moreover, even if the defendants could show Judge Olson never presided in gambling court, it would not be material. The Confidential Source's statement that he paid Judge Olson's clerk to influence the disposition of cases pending before Judge Olson appears in a completely separate paragraph than the remark concerning gambling court. Thus, it is not clear that a demonstration that Judge Olson never sat in gambling court would be impeaching. In addition, the information provided from 1975 was of slight importance. The more current information provided in May, June and September, 1980, was far more vital to the issuance of the authorization. Consequently, this court cannot find the asserted misrepresentation was material.

### 3. The October 30, 1980 Fight Between Costello and Judge Olson

■ On October 30, 1980, a Federal Bureau of Investigation report indicates that Costello and Judge Olson had a loud argument in a public restaurant. According to the report, "Costello grabbed Judge Olson by the wrist and shoved him slightly." The report further indicates that Judge Olson "exploded" and screamed at Costello "[y]ou are thrown out of 26th and California" (the Cook County criminal court building). Judge Olson purportedly threw Costello's glasses and ring across the room, breaking Costello's glasses. In addition, the report reveals that "[Judge] Olson poured a glass of wine over Costello's shirt and Costello threw a whole gallon bottle of wine across the room."

Defendants contend including some reference to the October 30, 1980 fight between Costello and Judge Olson in the affidavit would have revealed to Judge Parsons that Costello's statements concerning his relationship with Judge Olson were merely "rainmaking". Moreover, even if probable cause existed to believe there was a criminal relationship between Costello and Judge Olson prior to October 30, 1980, the defendants contend that including some reference to that evening's events would have eliminated any probable cause to believe there would be any future relationship between them. The government responds that Costello paid Judge Olson $1,000 in chambers the day after the fight (Jordan affidavit, ¶ 53) and that the fight had no significance after that evening.

In the view of this court, the defendants have not made a substantial preliminary showing that Agent Jordan knowingly, intentionally or recklessly omitted any reference to the October 30, 1980 fight. The F.B.I. report of the fight indicates that "it was evident that Judge Wayne Olson and James Costello were both intoxicated". Under these circumstances, there is no indication that Agent Jordan was knowingly, or intentionally attempting to mislead Judge Parsons. Agent Jordan could quite reasonably have concluded that the fight was a one time occurrence brought about by the parties' intoxication. With Costello's appearance in Judge Olson's chambers the very next day, there was no reason for Jordan (or Judge Parsons) to conclude that the parties would fail to put the incident behind them. Thus, in the present case, this court cannot conclude the defendants have made a substantial preliminary show-

ing that Agent Jordan acted improperly or that the subject omission was material.

#### 4. Additional "Rainmaking" Statements

▮ The defendants also challenge Jordan's failure to include various other "rainmaking" statements allegedly uttered by Costello which they contend would have further undermined Costello's credibility. Specifically, defendants point to Costello's claims that he had bribed eleven other judges and the first assistant state's attorney during his first year in private practice. In addition, the defendants contend the government omitted any reference to two occasions on which Costello recanted prior statements regarding bribes. The government responds that Jordan did not omit any recantation or contradiction *of any bribe alleged in his affidavit* and challenges the accuracy of the defendants' argument that Costello claimed to have bribed eleven judges.

There is no merit to the defendants' argument. A thorough review of the transcripts relied upon by the defendants reveals that Costello claimed to have bribed two, or at the most three, judges other than Judge Olson. This figure is hardly so large as to automatically generate doubt concerning Costello's veracity. Moreover, there is nothing to indicate that Jordan was aware of any fact which would have lead him to doubt Costello's representations. Finally, the fact that Costello recanted some, but not other, bribery claims only serves to support his credibility. Thus, Costello's other "rainmaking" statements do not support the defendants' request for a *Franks* evidentiary hearing.

#### 5. Costello's Intoxication

▮ Defendants contend Agent Jordan also failed to inform Judge Parsons that James Costello was intoxicated on many of the occasions his statements were recorded by Hake. Specifically, defendants make reference to an October 21, 1980 Federal Bureau of Investigation report indicating that Costello was "obviously intoxicated"

on that date. Moreover, at oral argument, citing the tone of Costello's voice on the consensual recordings, Costello's attorneys represented that Costello was intoxicated on at least seven other occasions on which he uttered statements relied upon in Jordan's affidavit.

Defendants' position is again without merit. The fact that Costello was "obviously intoxicated" on October 20, 1980 is immaterial; nothing Costello said on that date is recited in the affidavit. In addition, Costello's counsels' mere representation that Costello was intoxicated on six or seven other occasions is insufficient to constitute the competent evidence necessary to trigger an evidentiary hearing; no observer's affidavit or other competent evidence is supplied. Finally, even if Costello was intoxicated, it is not clear his statements would be any less believable; there is no reason to believe Costello would have been any less candid while imbibing alcoholic beverages than while sober in the courthouse. Thus, the asserted omissions concerning Costello's sobriety do not warrant the holding of a *Franks* hearing.

#### 6. Hake's Coercion of George Jordan

▮ Finally, defendants contend that Agent Jordan failed to disclose the fact that Terry Hake coerced George Jordan into accepting Costello as his court appointed counsel. The November 7, 1980 F.B.I. report indicates that Hake "complained to Costello that he was the one who intimidated [George Jordan] and forced him to seek representation by Costello." This fact is also reflected in the F.B.I.'s October 31, 1980 report. Agent Jordan's affidavit, however, merely reflects that "Costello owed Judge Olson one half of $1,125 in bond money received on the George Jordan case of October 30, 1980 as well as money on some other cases Olson had referred to Costello over the past several days." (¶ 53j)

Agent Jordan's omission of the fact that Hake coerced the subject defendant into accepting Judge Olson's appointment of Costello as his attorney is completely im-

material. Whether the defendant accepted Costello's appointment on his own or on the basis of Hake's actions does not alter the material fact that Costello paid Judge Olson one-half of the defendant's bond in accordance with the terms of their purported arrangement. If Agent Jordan had included the fact that the defendant had been reluctant to accept Costello's appointment until Hake intervened, it is difficult to envision how the significance of the payment would have changed. Thus, Agent Jordan's omission of the fact that Tery Hake coerced George Jordan into accepting Costello as his court appointed attorney cannot serve as a basis for holding a *Franks* hearing.

### 7. Conclusion

In the view of this court, the misrepresentations and omissions relied upon by the defendants are insufficient, both individually and cumulatively, to warrant the holding of a *Franks* hearing. Even assuming all of the facts allegedly "misrepresented" by Agent Jordan had been properly reflected in his affidavit and all of the alleged "omissions" had been included, there is no reason to believe Judge Parsons' decision would have been altered. Moreover, the defendants have fallen far short of making a substantial preliminary showing that Agent Jordan knowingly, intentionally or recklessly misrepresented or omitted facts in his affidavit. The defendants' request for a *Franks* hearing with respect to the issue of probable cause is, therefore, denied.

### C. Necessity for Electronic Surveillance

Defendants' next contention concerns the necessity for the subject electronic surveillance. Defendants contend that, on its face, the application failed to establish that alternative investigative techniques would not have been successful in obtaining evidence against them. Moreover, defendants contend the applications contained various misrepresentations and omissions which would have materially altered Judge Parsons' decision with respect to the necessity of the electronic surveillance.

### 1. History of the Necessity of Requirement

The statutory necessity requirement has its constitutional origin in *Berger v. New York*, 388 U.S. 41, 60, 87 S.Ct. 1873, 1884, 18 L.Ed.2d 1040 (1967). In *Berger*, the Supreme Court held New York's electronic surveillance statute was unconstitutional on its face. The Court cited eight different constitutional deficiencies in the statute *Id.* at 58–60, 87 S.Ct. at 1883–1884. Among the deficiencies was the fact that the statute failed to require law enforcement officials to make a showing of "special facts" or "exigent circumstances" before obtaining authorization. Such a showing was necessary in order to overcome the problem of not giving the interceptee prior notice of the electronic search and seizure.[8]

A year after *Berger* was decided, Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968, P.L. 90–351 (1968) (Codified as 18 U.S.C. §§ 2510 *et at* (1982)). Among the provisions of that Act is 18 U.S.C. 2518(1)(c), which requires that each application for an order authorizing or approving the interception of a wire or oral communication include:

> a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

A closely related provision of the Act permits a judge to enter an *ex parte* order approving the interception of wire or oral communications only if he or she deter-

---

8. Specifically, the Court stated:

    Finally, the statute's procedure, necessarily because its success depends on secrecy, has no requirement for notice as do conventional warrants, nor does it overcome this defect by requiring some showing of special facts. On the contrary, it permits unconsented entry without any showing of exigent circumstances. Such a showing of exigency, in order to avoid notice, would appear more important in eavesdropping, with its inherent dangers, then that required when conventional procedures of search and seizure are utilized.

mines "on the basis of the facts submitted by the application" that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c) (1982).

The legislative history of these provisions make it abundantly clear that 18 U.S.C. § 2518(1)(c) and (3)(c) were enacted to satisfy the "special facts" or "exigent circumstances" requirement of *Berger.* U.S.Code Cong. and Adm.News 2112, 2113, 2161–63, 2190–91 (1968); *see also* Blakey and Hancock, "A Proposed Electronic Surveillance Control Act", 43 N.D.Law 657, 673–74 f.n. 35 (1968) Moreover, subsequent lower court decisions have linked the requirements of *Berger* with those provisions. *United States v. Forlano,* 358 F.Supp. 56, 58 (S.D.N.Y.1973) and *United States v. Leta,* 332 F.Supp. 1357, 1361 f.n. 5 (M.D.Pa.1971); *see also United States v. Ford,* 553 F.2d 146, 151 (D.C.Cir.1977). Thus, the "necessity" requirement of § 2518(1)(c) and (3)(c) has both a constitutional and statutory basis.

The legislative history of § 2518(1)(c) and (3)(c) reveals that Congress intended electronic surveillance applications to contain "a full and complete statement as to whether or not normal investigative procedures have been tried and have failed or why these are unlikely to succeed if tried, or to be too dangerous." U.S.Code Cong. & Admin.News, 2112, 2190 (1968) Congress envisioned normal investigative procedures as including:

> ... [1] standard visual or aural surveillance techniques by law enforcement officers, [2] general questioning or interrogation under an immunity grant, [3] use of regular search warrants, and [4] the infiltration of conspiratorial groups by undercover agents or informants. *Id.*

Congress cautioned, however, that "[m]erely because a normal investigative technique is theoretically possible, it does not follow that it is likely." *Id.* Moreover, in deter-

mining whether or not a particular application satisfies the necessity requirement, the legislative history reveals that ·Congress intended that "the showing be tested in a practical and common sense fashion" with "consideration of all the facts and circumstances." *Id.*

In commenting upon the purpose of these provisions, the Supreme Court has noted that § 2518 was enacted in order "to make doubly sure that the statutory authority be used only with restraint and only where circumstances warrant the surreptitious interception of wire and oral communications. These procedures [are] not to be routinely employed as the initial step in criminal investigation." *United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1826–1827, 40 L.Ed.2d 341 (1974) Moreover, the Court has noted that "wiretapping is not [to be] resorted to in situations where traditional investigative techniques would suffice to explore the crime." *United States v. Kahn,* 415 U.S. 143, 153 f.n. 12, 94 S.Ct. 977, 983 f.n. 12, 39 L.Ed.2d 225 (1974). Finally, the Court has stated that "[t]he plain effect of the detailed restrictions of § 2518 is to guarantee that wiretapping or bugging occurs only when there is a genuine need for it and only to the extent that it is needed." *Dalia v. United States,* 441 U.S. 238, 250, 99 S.Ct. 1682, 1689, 60 L.Ed.2d 177 (1979).

Despite having commented on § 2518 in a general fashion, the Supreme Court has yet to decide a case resting on the issue of "necessity". The federal circuit courts, however, have frequently addressed the issue of "necessity". The vast majority of those cases have dealt with the necessity of utilizing electronic surveillance to obtain evidence concerning drug and gambling conspiracies.[9] Although the greater number of those decision are not factually analogous to the present case, several general principles recognized in those decisions are applicable here.

---

**9.** *United States v. Brown,* 761 F.2d 1272 (9th Cir.1985) (drugs); *United States v. Wilkinson,* 754 F.2d 1427, 1433–34 (2nd Cir.1985) (drugs); *United States v. Domme,* 753 F.2d 950, 955 (11th Cir.1985) (drugs); *United States v. Bascaro,* 742 F.2d 1335, 1347 (11th Cir.1984) (drugs); *United States v. Alonso,* 740 F.2d 862, 867–69 (11th Cir.1984) *cert. denied,* —— U.S. ——, 105 S.Ct.

928, 83 L.Ed.2d 939 (1985) (drugs); *United States v. Webster,* 734 F.2d 1048, 1054–55 (5th Cir.) *cert. denied,* —— U.S. ——, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984) (drugs); *United States v. Newman,* 733 F.2d 1395, 1399 (10th Cir.1984) (drugs); *United States v. Ruggiero,* 726 F.2d 913, 924 (2nd Cir.) *cert. denied,* —— U.S. ——, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984) (organized crime); *United States v. Terry,* 702 F.2d 299, 309–10 (2nd Cir.) *cert. denied* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983) (drugs); *United States v. Southard,* 700 F.2d 1 (1st Cir.) *cert. denied* —— U.S. ——, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983) (gambling); *United States v. Lilla,* 699 F.2d 99, 100–105, 78 L.Ed.2d 97 (2nd Cir.1983) (drugs); *United States v. Robinson,* 698 F.2d 448, 452–53 (D.C.Cir.1983) (fencing conspiracy); *United States v. Johnson,* 696 F.2d 115, 123–24 (D.C.Cir.1982) (drugs); *United States v. Messersmith,* 692 F.2d 1315, 1317–18 (11th Cir.1982) (drugs); *United States v. Brooklier,* 685 F.2d 1208, 1221–22 (9th Cir.1982) *cert. denied* 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983) (organized crime); *In re DeMonte,* 674 F.2d 1169, 1173–74 (7th Cir.1982) (unclear); *United States v. Timpani,* 665 F.2d 1, 14 f.n. 7 (1st Cir.1981) (loansharking-gambling); *United States v. Martino,* 664 F.2d 860, 867–868 (2nd Cir.1981) *cert. denied* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982) (drugs); *United States v. Johnson,* 645 F.2d 865, 867 (10th Cir.) *cert. denied* 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981) (drugs); *United States v. Jabara,* 618 F.2d 1319, 1326 (9th Cir.) *cert. denied* 446 U.S. 987, 100 S.Ct. 2973, 64 L.Ed.2d 845 (1980) (drugs); *United States v. Atkins,* 618 F.2d 366, 371–72 (5th Cir.1980) (drugs); *United States v. Kail,* 612 F.2d 443, 446–47 (9th Cir.1980) *cert. denied* 445 U.S. 966, 100 S.Ct. 1657, 64 L.Ed.2d 242 (1980) (gambling); *United States v. Bailey,* 607 F.2d 237, 241–43 (9th Cir.1979) *cert. denied* 445 U.S. 934, 100 S.Ct. 1327, 63 L.Ed.2d 769 (1980) (drugs); *United States v. Vazquez,* 605 F.2d 1269, 1282 (2nd Cir.) *cert. denied* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979) (drugs); *United States v. Santora,* 600 F.2d 1317, 1318–24 *amen'd.* 609 F.2d 433 (9th Cir.1979); (drugs and stolen goods); *United States v. Martin,* 599 F.2d 880, 886–87 (9th Cir.) *cert. denied* 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1067 (1979) (drugs); *United States v. Almonte,* 594 F.2d 261, 264 (1st Cir.1979) (counterfeiting); *United States v. Baker,* 589 F.2d 1008, 1011 (9th Cir.1979) (gambling); *United States v. Cifarelli,* 589 F.2d 180, 183 (5th Cir.1979) (extortion); *United States v. Clements,* 588 F.2d 1030, 1035–36 (5th Cir.) *cert. denied* 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243 (1979) (gambling); *United States v. Martinez,* 588 F.2d 1227, 1230–33 (9th Cir.1978) (gambling); *United States v. Gerardi,* 586 F.2d 896, 897–98 (1st Cir.1978) (gambling); *United States v. Williams,* 580 F.2d 578, 587 f.n. 54 (D.C.Cir.) *cert. denied* 439 U.S. 832, 99 S.Ct. 112, 58 L.Ed.2d 127 (1978) (gambling); *United*

*States v. Kim,* 577 F.2d 473, 474 (9th Cir.1978) (gambling); *United States v. Rotchford,* 575 F.2d 166, 173 (8th Cir.1978) (gambling); *United States v. Hyde,* 574 F.2d 856, 867–69 (5th Cir. 1978) (drugs); *United States v. Smith,* 565 F.2d 292, 294 (4th Cir.1977) (drugs); *United States v. Abascal,* 564 F.2d 821, 825–26 (9th Cir.1977) *cert. denied* 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978) (drugs); *United States v. Scafidi,* 564 F.2d 633, 641 (2nd Cir.1977) *cert. denied* 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1978) (gambling); *United States v. Losing,* 560 F.2d 906, 907 (8th Cir.) *cert. denied* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977) (drugs); *United States v. Santarpio,* 560 F.2d 448, 449–52 (1st Cir.) *cert. denied* 434 U.S. 984, 98 S.Ct. 609, 54 L.Ed.2d 478 (1977) (gambling); *United States v. Diadone,* 558 F.2d 775, 778 (5th Cir.1977) *cert. denied* 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978) (gambling); *United States v. Clerkley,* 556 F.2d 709, 712–14 (4th Cir.1977) *cert. denied* 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978) (gambling); *United States v. Fury,* 554 F.2d 522, 529–30 (2nd Cir.1977) *cert. denied* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977) (transportation of stolen automobiles); *United States v. Easterling,* 554 F.2d 195, 196 (5th Cir. 1977) (gambling); *United States v. Rabstein,* 554 F.2d 190, 191–93 (5th Cir.1977) (gambling); *United States v. Abramson,* 553 F.2d 1164, 1171 (8th Cir.) *cert. denied* 443 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977) (gambling); *United States v. Landmesser,* 553 F.2d 17 (6th Cir.) *cert. denied* 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126 (1977) (gambling); *United States v. Sklaroff,* 552 F.2d 1156 (5th Cir.1977) *cert. denied* 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978) (gambling); *United States v. Alfonso,* 552 F.2d 605, 606 (5th Cir.) *cert. denied* 434 U.S. 857, 98 S.Ct. 179, 54 L.Ed.2d 129 (1977) (gambling); *United States v. Sandoval,* 550 F.2d 427 (9th Cir.1976) *cert. denied* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977) (drugs); *United States v. Spagnuolo,* 549 F.2d 705 (9th Cir.1977) (gambling); *United States v. Jackson,* 549 F.2d 517, 536–37 (8th Cir.) *cert. denied* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977) (drugs); *United States v. Scibelli,* 549 F.2d 222, 226–28 (1st Cir.) *cert. denied* 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977) (gambling); *United States v. De La Fuente,* 548 F.2d 528 (5th Cir.) *cert. denied* 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977) (drugs); *United States v. Woods,* 544 F.2d 242, 257 (6th Cir.1976) *cert. denied* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977) (drugs); *United States v. Anderson,* 542 F.2d 428, 431 (7th Cir.1976) (gambling); *United States v. Matya,* 541 F.2d 741, 742 (8th Cir.) *cert. denied* 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977) (firearms); *United States v. DiMuro,* 540 F.2d 503 (1st Cir.1976) *cert. denied* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977) (gambling); *United States v. McCoy,* 539 F.2d 1050, 1051 (5th Cir.1976) *cert. denied* 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977) (gambling);

1467

■ First, as in other areas of warrant construction, reviewing courts give substantial deference to the determination of the issuing judge. In *United States v. Brown*, 761 F.2d 1272 (9th Cir.1985), for example, the court held that "we review conclusions that the wiretaps were necessary in each situation only for an abuse of discretion." *See also United States v. Daly*, 535 F.2d 434, 438 (8th Cir.1976) and *United States v. Smith*, 519 F.2d 516, 518 (9th Cir.1975). Similarly, the Eleventh Circuit has recently stated that the issuing court "is clothed with broad discretion in its consideration of the application." *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir.1984) *cert. denied,* —— U.S. ——, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985) Finally, so long as a "factual predicate" exists in the affidavit, this circuit has recognized that, the authorizing court's decision will not be reversed. *In re DeMonte*, 674 F.2d 1169, 1174 (7th Cir.1982); *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir.1976).

■ Second, it is generally recognized that "courts will not invalidate a wiretap order simply because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not." *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir.1978) Instead, courts have consistently adhered to Congress' admonition that they take a "pragmatic" approach, *United States v. Vento*, 533 F.2d 838, 849 (3rd Cir.1976), and view applications "as a whole" in a "practical and commonsense fashion." *In re DeMonte*, 674 F.2d 1169, 1174 (7th Cir.1982) and *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir.1976). Consistent with this, the Seventh Circuit has also recognized that the government's burden of establishing its compliance with § 2518(1)(c) and (3)(c) is not great. *Id. See also United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir.1977)

■ Third, courts have recognized that the application must contain a full and complete statement of the facts upon which necessity is asserted to exist; mere conclusory allegations based upon the general experience of an agent are not sufficient to satisfy the requirements of § 2518(1)(c) and (3)(c). *United States v. Lilla*, 699 F.2d 99, 104 (2nd Cir.1983); *In re DeMonte*, 674 F.2d 1169, 1174 (7th Cir.1982); and *United States v. Kalustian*, 529 F.2d 585, 590 (9th Cir.1975) The application must demonstate why normal investigative procedures are insufficient in that particular case. *Id.*

*United States v. Johnson*, 539 F.2d 181, 182 (D.C. Cir.1976) *cert. denied* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977) (drugs); *United States v. Adams*, 536 F.2d 303 (9th Cir.1976); *United States v. Feldman*, 535 F.2d 1175, 1176 (9th Cir.) *cert. denied* 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976) (gambling); *United States v. Daly*, 535 F.2d 434, 439 (8th Cir.1976) (mail fraud); *United States v. Pezzino*, 535 F.2d 483, 484 (9th Cir.) *cert. denied* 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 106 (1976) (gambling); *United States v. Kirk*, 534 F.2d 1262, 1268 (8th Cir.1976) *cert. denied* 430 U.S. 906, 97 S.Ct. 1174, 51 L.Ed.2d 581 (1977) (drugs); *United States v. Vento*, 533 F.2d 838, 843–50 (3rd Cir.1976) (drugs); *United States v. Cacace*, 529 F.2d 1167, 1168 (5th Cir.) *cert. denied* 429 U.S. 841, 97 S.Ct. 115, 50 L.Ed.2d 109 (1976) (drugs); *United States v. Lawson*, 545 F.2d 557, 563 (7th Cir. 1975) (drugs); *United States v. Kalustian*, 529 F.2d 585, 586 (9th Cir.1975) (gambling); *United States v. Turner*, 528 F.2d 143, 152 (9th Cir.) *cert. denied* 423 U.S. 996, 96 S.Ct. 426, 45 L.Ed.2d 371 (1975) (drugs); *United States v. Steinberg*, 525 F.2d 1126, 1127 (2nd Cir.1975) *cert. denied* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976) (drugs); *United States v. Smith*, 519 F.2d 516 (9th Cir.1975) (drugs); *United States v. Armocida*, 515 F.2d 29, 37–38 (3rd Cir.) *cert. denied* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975) (drugs); *United States v. Kerrigan*, 514 F.2d 35, 36, 96 S.Ct. 111, 46 L.Ed.2d 84 (9th Cir.) *cert. denied* 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975) (gambling); *United States v. Schaefer*, 510 F.2d 1307 (8th Cir.) *cert. denied* 421 U.S. 975, 95 S.Ct. 1975, 44 L.Ed.2d 466 (1975) (gambling); *In re Dunn*, 507 F.2d 195, 196 (1st Cir.1974) (extortion); *United States v. Robertson*, 504 F.2d 289, 290 (5th Cir. 1974) *cert. denied* 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975) (gambling); *United States v. Brick*, 502 F.2d 219, 220 (8th Cir.1974) (gambling); *United States v. O'Neill*, 497 F.2d 1020, 1021 (6th Cir.1974) (gambling); *United States v. Pacheco*, 489 F.2d 554 (5th Cir.1974) *cert. denied* 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975) (gambling); *United States v. Bynum*, 485 F.2d 490, 491 (2nd Cir.1973) *vacated* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974) (drugs); and *United States v. Bobo*, 477 F.2d 974 (4th Cir.1973) *cert. denied* 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 774 (1975) (gambling).

*See also United States v. Robinson,* 698 F.2d 448, 453 (D.C.Cir.1983) ("[w]e must be careful not to permit the government merely to characterize a case as a 'drug conspiracy' or a 'fencing conspiracy' that is therefore inherently difficult to investigate. The affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail.")

██ Finally, courts have not required that every normal investigative technique be addressed in the government's application for electronic surveillance. In *United States v. Alonso,* 740 F.2d 862, 868 (11th Cir.1984) *cert. denied,* — U.S. —, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985), for example, the court held "[t]here need not be an exhaustive recitation of the progress of the investigation, excluding every possible line of inquiry." Similarly, the court in *United States v. Vento,* 533 F.2d 838, 850 (3rd Cir.1976) did not find it controlling that the government's application failed to mention the use of undercover agents. Finally, the Ninth Circuit did not find an application deficient because it failed to discuss the use of a government informant making consensual recordings. *United States v. Pezzino,* 535 F.2d 483, 484 (9th Cir.) *cert. denied* 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 106 (1976)

## 2. Sufficiency of the Application on its Face

Paragraph fifty-four of Jordan's affidavit, captioned "use of other investigative techniques", purports to specifically address the necessity of electronic surveillance. Lines five through nine list certain normal investigative techniques utilized in the investigation of public corruption cases. Lines nine through eleven continue that "[a]ll of these techniques, as described more fully herein, either have been tried or failed, or reasonably appear unlikely to succeed." The remainder of that paragraph then goes on to describe which normal investigative techniques have been tried and failed, and why certain others would be unlikely to succeed.

### a. Development of Informants or Witnesses

██ Jordan's affidavit initially discusses the development and use of informants or witnesses. Jordan mentions Hake, but concludes he "has not and will not be in a position to make contact with [Judge] Olson when [Judge] Olson is soliciting and accepting bribes." In the view of this court, this conclusion is supported by the remainder of the affidavit. Paragraph twenty reveals that Costello requested Hake to excuse himself at lunch so that Costello could be alone with Judge Olson "to give Wayne his bread." Paragraph forty-three reveals that Judge Olson's clerk, perhaps at the Judge's urging, was quite cautious around Hake and refused to accept a bribe in his presence. Paragraphs forty-six through fifty-two reveal that Judge Olson was quite careful in discussing cases with Hake. Finally, in his capacity as assistant state's attorney, Hake lacked any motive for bribing Judge Olson or any interest in being present while a payment was actually occurring.

Apparently recognizing the inconsistency between Hake's official capacity and his developing a corrupt relationship with Judge Olson, the defendants suggest that Hake could have left the State's Attorney's office, entered private practice and begun a criminal relationship with Judge Olson. Defendants point out that, in fact, Hake actually did eventually leave the state's attorney's office and develop such a corrupt relationship with another judge.

As previously noted, however, "courts will not invalidate a wiretap order simply because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not." *United States v. Hyde,* 574 F.2d 856, 867 (5th Cir.1978). In the present case, this court does not find it was at all likely that Hake could have left the state's attorney's office and developed a criminal relationship with Judge Olson within a reasonable time period. The government was not required to give up an inside informer for the speculative possibility of developing

more direct evidence months or years later. Moreover, even if Hake was able to develop a corrupt relationship with Judge Olson and record a single criminal transaction, there is no indication that Judge Olson would have disclosed the extent of his criminal activities to Hake. *See United States v. Vento*, 533 F.2d 838, 850 (3rd Cir.1976) ("Defendants ... take an unreasonably narrow view of the scope of this investigation. Although normal investigative techniques might have been sufficient to implicate Gregorio in thefts from interstate shipments, such approaches could not show the scope of the conspiracy or the nature of Gregorio's on-going criminal activity.") Thus, defendants suggestion that the government could have made further use of Terry Hake as an undercover agent is without merit.

Jordan also discussed the development and use of other informants and witnesses. With respect to other attorneys practicing in Cook County, Jordan's affidavit provides:

> from my experience and from the experience of other Special Agents of the Federal Bureau of Investigation, lawyers are reluctant to discuss or testify ... because of fear of the effect it will have on their ability to continue to practice law ... specifically, attorneys are reluctant to testify about occasions on which they have bribed or been extorted by judges and their bagmen because such testimony may well result in the disbarment of the attorney-witnesses.

Similarly, with respect to the development and use of Cook County court personnel, Jordan's affidavit sets forth:

> from my experience and the experience of other special agents of the Federal Bureau of Investigation, employees of the City of Chicago and Cook County are for the most part, patronage employees, and because of loyalty and/or fear for

their jobs, will not testify even under a grant of immunity.

Finally Jordan's affidavit provides that such individuals could not provide "the precise nature and scope of the illegal activities and the identity of all the offenders involved, due mainly to the secretive and private nature of the criminal transactions."

Defendants attack these allegations as conclusory, contending they do not relate to the facts of this particular case. Specifically, defendants contend the affidavit's conclusory statements regarding attorney's unwillingness to testify are contradicted by the existence of the government's Confidential Source as well as the government's own experience in other "Greylord" investigations. Similarly, defendants point out that court personnel have been successfully utilized in other similar prosecutions. Finally, defendants contend Jordan's affidavit does not adequately explain why these particular alternative sources could not have been employed.

Apart from Costello and the Confidential Source, Jordan's affidavit lists thirteen additional attorneys either having directly bribed Judge Olson or as having at least suggested an ability to do so.[10] In addition, Jordan's affidavit specifically describes two former clerks having previously acted as "bagmen" for Judge Olson.[11] In his affidavit, however, Jordan does not indicate whether any of the fifteen attorneys, including Costello and the government's Confidential Source, or court personnel had been requested to cooperate, testify or wear a consensual monitor.

With respect to all of the attorneys and court personnel except the government's Confidential Source, however, this court has little difficulty in concluding Jordan's affidavit was sufficient to satisfy the necessity requirement. There was no re-

---

**10.** *See* Jordan's Affidavit: Atty. # 1—¶¶ 9, 13 and 53; Atty. # 2—¶¶ 36, 42, 45 and 53; Atty. # 3—¶ 36; Atty. # 4—¶ 36; Atty. # 5—¶ 36; Atty. # 6—¶ 36; Atty. # 7—¶¶ 40, 41 and 44; Atty. # 8—¶¶ 42, 50 and 53; Atty. # 9—¶ 43; Atty. # 10 —¶¶ 46, 48, 49, 51, 52, 53, 53b and 53f; Atty.

# 11—¶ 53a; Atty. # 12—¶ 531; and Atty. # 13—¶ 53m.

**11.** *See* Jordan's Affidavit: Clerk # 1—¶¶ 17, 37 and 43 and Clerk # 2—¶¶ 36 and 38.

quirement that Agent Jordan or the F.B.I. actually approach those individuals. Here, as in *United States v. Alonso*, 740 F.2d 862 (11th Cir.1984) *cert. denied* — U.S. —, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985), (where the object of the investigation was a group of corrupt Dade County detectives), "[t]he use of subpoenas or opening questioning ... certainly would [have] jeopardize[d] the investigation." *Id.* at 868. The government was clearly not required to place the entire investigation in jeopardy on the slim hope that an attorney or clerk could be coerced into testifying; indeed, with the exception of Costello, there is nothing to indicate the government had sufficient evidence to threaten any of these individuals with prosecution. Moreover, it is not clear that any of these individuals were aware of, or could have become aware of, the entire scope of Judge Olson's activities. Finally, as an attorney himself, Judge Parsons was in a position to evaluate the likelihood that attorneys would cooperate and testify and, as has previously been noted, his conclusion is entitled to deference by this court. *United States v. Daly*, 535 F.2d 434, 438 (8th Cir.1976).

Jordan's failure to indicate whether the government's Confidential Source was willing to testify is somewhat more troublesome. Unlike the other attorneys and court personnel, the Confidential Source could be approached without risking the investigation. Once again, however, it is unclear that Judge Olson would have disclosed the full extent of his activities to the Confidential Source. Moreover, Judge Parsons could have concluded from Agent Jordan's general comments that the Confidential Source was unwilling to testify. An affidavit need not specifically exclude every possible line of inquiry. *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir.1984) *cert. denied*, — U.S. —, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985) Thus, this court concludes that there was substantial evidence in Jordan's affidavit from which Judge Parsons could conclude that the use of informants or witnesses would be unlikely to succeed in revealing the scope of the defendants' alleged criminal transactions.

**b. Use of Grand Jury Subpoenas for Records**

In his affidavit, Jordan next discusses the inadequacy of public records. Specifically, Jordan notes that "given the vast degree of discretion with which a judge is imbued, these records would not provide direct evidence of money being solicited or paid or of the identities of those who pay." Defendants do not contend that such evidence, coupled with the information contained in the affidavit, would be sufficient to successfully prosecute Judge Olson. Clearly recognizing the discretion vested in judge's deciding factual issues on motions to suppress, Judge Parsons was entitled to conclude that subpoenaed records would be insufficient to convict Judge Olson. In addition, the subpoenaing of court or bank records would clearly have raised the suspicions of the defendants. *Id.* Thus, this court cannot find the use of Grand Jury subpoenas would have negated the necessity for electronic surveillance.

**c. Physical Surveillance**

Jordan's affidavit also touches upon the adequacy of physical surveillance. In his affidavit, Jordan notes that "physical surveillance in this investigation has been tried and has not succeeded, because ... meetings and unlawful payments are accomplished in a judge's chambers not accessible to the public." In addition, Jordan notes that further sustained surveillance could not be undertaken, "because of security measures in that building." Finally, the affidavit contains a diagram of the courtroom and chambers which indicates that any exterior viewing of the chambers would be difficult and could be easily frustrated.

Based upon the August 29, 1980 incident at a Chicago restaurant during which Costello purportedly asked Hake to excuse himself so that Costello could "give Wayne his bread", defendants contend the government could have positioned agents at the restaurant to observe other payments. De-

fendants argument, however, overlooks the fact that the August 29, 1980 incident was apparently a one time occurrence. Moreover, defendants' argument ignores the fact that Hake would probably not have had enough advance notice to arrange such surveillance; on August 29, 1980, for example, the affidavit reveals that Costello did not tell Hake that he intended to pay Judge Olson until they were on their way to the restaurant.

Jordan's remaining statements regarding the usefulness of physical surveillance are plainly supported by facts set forth in the affidavit. Consequently, this court cannot find Judge Parsons was incorrect in concluding physical surveillance was inadequate.

#### d. Use of an Undercover Agent

■ Finally, Jordan discounted the likelihood of successfully utilizing an undercover agent. The affidavit points out that "[Judge] Olson appears to be very careful not to take bribes from a lawyer if a third party is present." In addition, the affidavit provides that "[n]ew lawyers would have great difficulty gaining [Judge] Olson's confidence. An undercover agent is unlikely to be able to gain [Judge] Olson's confidence such that [Judge] Olson would engage in criminal transactions in his presence."

Defendants contend these conclusions are not substantiated by the factual statements in Jordan's affidavit. Defendants point to the government's Confidential Source's statements that attorneys "unknown to Judge Olson" could bribe him through Clerk # 1 (¶ 37), that "any lawyer" who needed help on a case in Judge Olson's courtroom could see Clerk # 2 (¶ 38), and that Judge Olson was "accepting bribes directly from defense attorneys." (¶ 39) In addition, defendants note the ease and speed with which Costello purported to develop a corrupt relationship with Judge Olson (¶ 17) and the large number of attorneys the government intimates were paying Judge Olson.[12] Finally, defendants

contend that Hake could have (and later did) introduce an attorney to Judge Olson for corrupt purposes.

In the view of this court, the possibility that an undercover attorney could have been introduced to Judge Olson and successfully engaged him in criminal conduct does not defeat the necessity of electronic surveillance. Once again, for the reasons previously noted, in all likelihood an undercover agent could not have uncovered the entire scope of Judge Olson's activities. Moreover, the likelihood of an unknown attorney successfully engaging in criminal conduct with Judge Olson was by no means certain. The facts contained in Jordan's affidavit suggest that Olson had long standing relationships with individuals purporting to bribe him, or that those individuals were "regulars" around the criminal courts. Costello, for example, informed Hake that he had accepted bribes for cooperative testimony while he was a Chicago police officer (¶ 45) and had accepted bribes from defense attorneys while assigned to another court as an assistant state's attorney (¶¶ 19 and 50) Similarly, the affidavit reveals that Attorney # 2 was "fixing cases" since at least 1971 and had paid Costello for cooperative testimony when the latter was a police officer. (¶ 45) It is not difficult to see why Judge Olson would "trust" such individuals. It is not entirely clear, however, that an unknown undercover agent could be successfully introduced to Judge Olson. The mere possibility that such a scheme would have succeeded, therefore, does not provide a basis for overruling Judge Parsons' determination of necessity.

#### 3. The Need for a <u>Franks</u> hearing with Respect to Necessity

■ Defendants contend there are various misrepresented and omitted facts which would have materially altered Judge Parsons' conclusion with respect to the necessity of the electronic surveillance. Specifically, defendants contend the statement

---

**12.** See supra footnote 10.

set forth in paragraph 3(c) that "[n]ormal investigative procedures have been tried and have failed to gather evidence sufficient to sustain prosecution of violations of these offenses and appear unlikely to succeed if tried further, or to be too dangerous" is false because many normal investigative techniques were never actually tried. In addition, defendants contend Agent Jordan's statements regarding the difficulty in obtaining official case dispositions (¶¶ 53c, 53d, 53g and 53h) are false because such information is a matter of public record and can be looked up by anyone without suspicion. Finally, defendants contend the government failed to disclose that Terry Hake had successfully introduced an attorney to Judge Olson for criminal purposes after the original authorization, but prior to requesting an extension of that authorization.

### a. Statement in Paragraph 3(c)

The statement set forth in paragraph 3(c) does not constitute a material misrepresentation. Indeed, it is quite questionable whether the statement is even false. It does not state that any specific investigative techniques have been tried and failed. Moreover, it does not contradict the statements set forth in paragraph fifty-three. Consequently, this court cannot find that statement forms any basis for a *Franks* hearing.

### b. Statements in Paragraphs 53, 53d, 53g and 53h

Similarly the statements set forth in paragraphs fifty-three do not constitute material misrepresentations. Even if the statements were false, which the defendants have failed to demonstrate with any competent evidence, (*See United States v. Reed,* 726 F.2d 339, 342 (7th Cir.1984)), they were not material. As this court has previously noted, given the discretion vested in judges deciding factual issues on motions to suppress, subpoenaed records would have been of little assistance in proving the existence of corrupt practices. Thus, even if those statements were false, they would

not have been material to Judge Parsons' determination that electronic surveillance was necessary.

### c. Hake's Introduction of an Attorney to Judge Olson

Finally, even if the government had disclosed that Hake had attempted to introduce an attorney to Judge Olson for criminal purposes, this court could not find that Judge Parsons would have concluded it was unnecessary to extend the subject surveillance. First, although it is plain from the December 3, 1980 consensual recording that Hake understood the attorney's motivation for seeking an introduction to Judge Olson was corrupt, it is not at all clear that Judge Olson was ever receptive to the idea; thus, the record in no way supports the contention that Judge Olson would engage in criminal conduct with an attorney introduced by Hake. Second, as has been previously noted, even if the record demonstrated Hake had been successful, such a successful introduction would in no way demonstrate the government's ability to uncover the entire scope of Judge Olson's activities through similar introductions. Thus, this court finds the failure to disclose the December 3, 1980 introduction on the government's application for an extension of the electronic surveillance was not material.

### D. Scope and Conduct of the Surveillance

Defendants next contend that the Fourth Amendment was violated because the authorizations were overly broad and the conduct of the surveillance was too intrusive. Specifically, defendants contend the first authorization was improper as written because, in addition to Judge Olson and James Costello, it authorized the interception of oral communications by Attorney # 1 and "others as yet unknown concerning the above described offenses". Defendants contend such an authorization constituted an impermissible "general warrant". Similarly, defendants contend the second authorization was improper as written be-

cause, in addition to Judge Olson and James Costello, it authorized the interception of oral communications by Attorneys # 1 and # 7, and "others as yet unknown concerning the above described offenses." Finally, defendants contend the conduct of the surveillance was overbroad and amounted to a general search because of the government's failure to properly minimize its interceptions of oral communications.

### 1. Authorizations As General Warrants

█ While the defendants focus solely upon the individuals whose oral communications the government was authorized to intercept, they ignore the other specific limitations set forth in the subject authorizations. In particular, in both orders the electronic surveillance is limited to oral communications "occurring at the premises known as the judge's chambers of Branch 57 of the Circuit Court of Cook County, Criminal Courts Building, 2600 South California, Chicago, Illinois." In addition, in both orders the authorization is limited to oral communications which:

> ... concern the solicitation and payment of bribes to influence the referral for legal representation; the outcome and disposition of criminal cases; the identities of others who bribe and who are extorted; the impact on commerce of the operation of said extortions and criminal enterprise; the precise nature and scope of the illegal activities and the identities and roles of others involved in the commission of these offenses.

Given these specific limitations as to location and content, this court cannot conclude the subject authorizations constituted invalid "general warrants". In *United States v. Donovan*, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977), the Court held that, in the wiretap context, the Fourth Amendment's specificity requirements "are satisfied by identification of the telephone line to be tapped and the particular conversations to be seized. It is not a constitutional requirement that all those likely to

be overheard engaging in incriminating conversations be named." *Id.* at 427 f.n. 15, 97 S.Ct. at 668 f.n. 15. *See also United States v. Licavoli*, 604 F.2d 613, 620 (9th Cir.1979) *cert. denied*, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980) In addition, subsequent decisions have steadfastly recognized that the government need not have probable cause to intercept the oral communications of each of the individuals named in the authorization. *United States v. Martin*, 599 F.2d 880, 884–85 (9th Cir. 1979); *United States v. Harvey*, 560 F.Supp. 1040, 1043, 1053 (S.D.Fla.1982); and *United States v. Dorfman*, 542 F.Supp. 345, 377–78 f.n. 30 (N.D.Ill.1982) *aff'd. sub nom., United States v. Williams*, 737 F.2d 594 (7th Cir.1984). *See also United States v. Tehfe*, 722 F.2d 1114, 1118 (3rd Cir.1983) *cert. denied* —— U.S. ——, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984). Thus, the fact that the subject authorizations arguably included the names of specific individuals for whom the government lacked probable cause and permitted the interception of oral communications involving "others as yet unknown" does not render the subject authorizations facially invalid as general warrants.

### 2. Conduct of the Subject Surveillance

Defendants also contend the subject surveillance was conducted in such a fashion as to constitute an invalid "general search." Specifically, defendants complain that the government failed to generally minimize its interceptions in accordance with 18 U.S.C. 2518(5). In addition, defendants contend the government failed to minimize particular interceptions. Finally, defendants contend the government failed to comply with the recording requirements of 18 U.S.C. § 2518(8)(a).

#### a. Background

At the hearings held on April 25 and 26, 1985, the manner in which the government conducted the subject electronic surveillance was disclosed. The evidence revealed that the government encountered various difficulties during the overhear due to the

nature of the facility and the type of the electronic surveillance. The judge's chamber itself was subject to fairly heavy pedestrian traffic. This was due, in part, to the presence of a "semi-public" washroom and telephone in the judge's chambers. Thus, attorneys, sheriffs and other court personnel were regularly entering the judge's chambers.

Moreover, the monitoring agents testified it is more difficult to minimize the intrusiveness of direct "bugging" than wiretapping. Unlike individuals commencing phone conversations, individuals engaging in face to face conversations do not ordinarily begin by identifying one another. In addition, the microphone cannot be placed directly in the telephone and, therefore, cannot be as free from interference. In addition, pen registers cannot be utilized to help identify the participants in the conversation. Finally, face to face conversations involve the use of hushed tones and the use of non-verbal communication not present in telephone conversations.

The government attempted to overcome some of these difficulties by requiring the monitoring agents to listen to "familiarization tapes" containing the voices of some of the individuals named in Agent Jordan's affidavit. In addition, the government attempted to utilize a warning system with Terry Hake transmitting a series of radio signals when specified individuals were entering Judge Olson's chambers; delays in relaying the messages and radio interference in the vicinity of the criminal courts building, however, hampered the effectiveness of this procedure.

The equipment utilized by the agents actually conducting the monitoring allowed them to monitor events taking place in Judge Olson's chambers without actually recording; there were separate switches for the tape recorder and microphone. According to one of the agents, at the time of this surveillance the Federal Bureau of Investigation did not have equipment which automatically recorded each time the microphone was activated. Moreover, the equipment available at that time apparently did not enable the agents to play back and relisten to the tapes at the time of the monitoring.

William Megary, the agent performing the vast majority of the monitoring (73%), was a 1975 law school graduate. Prior to the monitoring of Judge Olson's chambers, Megary had no electronic surveillance experience. His preliminary training consisted of various conferences with the Assistant United States Attorneys supervising the investigation, reviewing two memorandums prepared concerning special rules to be observed during the surveillance of Judge Olson's chambers, reviewing the familiarization tapes, reviewing Jordan's affidavit and reviewing Judge Parsons' authorization order. Megary testified that he had never personally read Title III or did any independent research concerning minimization requirements to prepare for the surveillance. Once the surveillance was under way, Megary testified that when "criminal conversations" were intercepted the conversations would be reviewed and discussed with Terry Hake and the other monitoring agents. Although Terry Hake kept logs of individuals entering and exiting Judge Olson's chambers, Megary testified that he never relistened to the tapes with Hake or Hake's logs to help familiarize himself with the parties' voices.

James Hersley also testified about his involvement in the actual monitoring. It was not clear from Hersley's testimony whether or not he had performed any prior electronic monitoring. Unlike Megary, Agent Hersley did not possess a law degree. Agent Hersley's testimony regarding his training and preparation for the surveillance basically conformed with the description given by Agent Megary. Agent Hersley did testify, however, that he had reviewed the statutes and regulations relating to electronic surveillance.

Finally, Agent Larry Dickerson testified concerning his involvement with the surveillance. Agent Dickerson, also a 1975 law school graduate, testified that his training basically conformed with that received by Megary and Hersley. In addi-

tion, however, Agent Dickerson testified that he began monitoring Judge Olsons' chambers with other agents before operating the microphone and recording equipment by himself. Once again, it is not clear whether Agent Dickerson had any prior monitoring experience.

All three agents testified concerning the special minimization rules set forth in the two memos dated November 13 and 29, 1980. Those rules, which cautioned against the interception of particular types of conversations, were to be kept in effect until the first clearly "criminal" conversation was intercepted. In addition, all three agents testified that they would leave the microphone on and the recording equipment off when there was no activity detectable in Judge Olson's chambers; the agents also testified, however, that as soon as a noise was detected in the chambers, they would begin recording and resume normal minimization procedures.

### b. Applicable Statutory Provisions

Title 18, U.S.C. § 2518(5) provides, in relevant part, that the interception of oral communications "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter..." Section 2518(8)(a) provides that "[t]he contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device." Finally, Section 2511(2)(c) provides that "[i]t shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication..."

The definitions of the key terms used in the Act are set forth in Title 18 U.S.C. § 2510 (1982). The term "oral communication" is defined as "any oral communication uttered by a person exhibiting an expecta-

tion that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2) (1982) The statute provides that "intercept means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device." 18 U.S.C. § 2510(4) (1982).

### c. General Minimization

██ Defendants initially contend the government flagrantly failed to minimize non-criminal conversations throughout the course of the surveillance. Specifically, applying 30 and 90 seconds as the lengths of time necessary to minimize particular types of conversations, the defendants conclude that the government's agents minimized just forty-two percent of the intercepts which were long enough to minimize. Moreover, since the defendants allege that only four percent of the intercepts long enough to minimize yielded any intelligence, the defendants contend the monitoring agents unreasonably seized fifty-four percent of the recorded intercepts.[13] As a result, defendants contend the suppression of all intercepted conversations is required. Not surprisingly, the government's figures present a somewhat different view of their efforts at minimization. There are two principal reasons for the differences. Initially, the government drastically reduces the number of intercepts upon which the defendants' percentages are calculated. The government does not include 598 instances when the recorder was activated while Judge Olson was working alone at his desk or while his chambers was unoccupied; since those instances did not involve an aural acquisition of the contents of any oral communication uttered by a person exhibiting an expectation of privacy, the government concludes there were no "intercepts". 18 U.S.C. § 2510(4) (1982). Moreover, the government deducts seven-

---

**13.** Since the defendants claim they were not aware of the monitoring agents' practice of listening to Judge Olson's empty or silent chambers without recording when they prepared their minimization figures, their actual percent-

age of unreasonably non-minimized intercepts is undoubtedly larger. Because the government does not consider such monitoring as being within the scope of Title III, its figures would not be altered. *See infra* text.

ty-four interceptions of conversations involving Terry Hake; since Hake had consented to the interception of oral communications to which he was a party, the government contends the recording of those conversations did not constitute intercepts. *See* 18 U.S.C. § 2511(2)(c) (1982) and *United States v. White,* 401 U.S. 745, 752–53, 91 S.Ct. 1122, 1126–27, 28 L.Ed.2d 453 (1971). Finally, the government allowed the agents a much longer period in which to determine whether a conversation should be minimized; the government utilized 180 seconds as constituting the period of time too short to minimize. *See United States v. Losing,* 560 F.2d 906, 908–909 (8th Cir.) *cert. denied* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977). Utilizing these assumptions, the government concludes that the agents minimized approximately eighty two percent of the intercepts that were long enough to minimize. (874 minimized, 195 not minimized; 145 additional non-minimized conversations were classified as consensual).

In the view of this court, the assumptions utilized by the government in arriving at its figures are reasonable. A 180 second time frame for deciding whether or not to minimize is reasonable in this case. *Id.* As was previously noted, the area under surveillance was noisy and subject to substantial pedestrian traffic. Moreover, for the reasons previously discussed, the vary nature of this type of electronic surveillance requires that the monitoring agents be given a longer time frame in which to minimize than in ordinary wiretap cases. Thus, the sole issue is whether or not the government's figures demonstrate compliance with § 2518(5)'s requirement that electronic surveillance be conducted in such a manner as to minimize the unauthorized interception of communications.[14]

Of the total intercepts that were long enough to minimize and that were not minimized, only 10.6 percent involved matters other than consensual conversations to which Terry Hake was a party, or discussions which were suspicious, clearly criminal or of intelligence value. Much higher percentages have been found acceptable by other courts. (*See United States v. Quintana,* 508 F.2d 867, 873 (7th Cir.1975) and cases cited therein.) *See also United States v. King,* 335 F.Supp. 523, 541 (S.D. Cal.1971) *aff'd in part, rev'd in part,* 478 F.2d 494 (9th Cir.) *cert. denied* 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d 94 (1973). Thus, the statistical evidence with respect to minimization does not reflect any intent by the monitoring agents to avoid the statutory minimization requirements, *United States v. Hinton,* 543 F.2d 1002 (2nd Cir. 1976) *cert. denied* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1977), or that their conduct was unreasonable under the circumstances. *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). *See also* 54 A.L.R.Fed. 120. Defendants' motion to suppress all of the intercepts is, therefore, denied.

### d. Particular Minimizations

Defendants also challenge the monitoring agents failure to minimize specific conversations between Judge Olson and certain unnamed attorneys prior to the interception of certain purportedly criminal conversations. If the government had properly minimized those conversations, the defendants contend the purportedly criminal conversations would not have been intercepted.[15] Thus, the defendants contend the

---

14. While this court accepts the government's summary of the monitoring agents minimization efforts, it should be noted that this summary method of reporting is far from perfect. Unlike the defendants, the government failed to provide any evidence disclosing the way in which the monitoring agents classified each intercept. Thus, while the government was able to effectively cross-examine the defendants concerning their classification of a few conversations, the defendants were not afforded the same luxury. The government merely provided summary tables with no underlying documentation. Defendants approach was far superior in this respect.

15. At the minimization hearing, the defendants mainly focused upon the propriety of monitoring agent Megary's interception of the December 3, 1980 conversation between Judge Olson and Attorney # 7 which triggered the abandonment of the government's special minimization

intercepts of those purportedly criminal conversations should be suppressed.

▮ Defendants cannot move to suppress pertinent, criminal conversations on the basis of § 2518(5)'s minimization requirement. Section § 2518(5) merely applies to the minimization of intercepted, non-pertinent, innocent conversations; it does not proscribe a duty to minimize pertinent, criminal conversations within the scope of the authorized surveillance. *See Scott v. United States*, 436 U.S. 128, 141, 98 S.Ct. 1717, 1725, 56 L.Ed.2d 168 (1978).[16]

▮ Nor, absent a pattern of non-minimization, can a monitoring agent's failure to minimize the interception of an apparently innocent, non-pertinent conversation serve as a basis for suppressing an intercepted criminal conversation. The concept of minimization concerns the government's conduct "during the duration of the authorized interception," *United States v. Scott*, 504 F.2d 194, 197 (D.C.Cir.1974) *aff'd* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), and requires a showing of "repeated, unreasonable interceptions" before improper minimization will be found. *United States v. Pine*, 473 F.Supp. 349 (D.Md.1978). The interception of some innocent, non-pertinent conversations is "inevitable." *Id.* Isolated failures to minimize are, therefore, irrelevant. Thus, given an overall pattern of proper minimization, a monitoring agent's failure to minimize an innocent conversation immediately prior to the interception of a criminal conversation is not a basis for suppression.

▮ Moreover, the logic upon which the defendants' contrary conclusion is based, that if the government had properly minimized the subject conversations would not have been intercepted, is not sound. If the government had "properly minimized" the specific innocent conversations to which the defendants refer, in all probability, the sub-

ject criminal conversations would still have been intercepted. Section 2518(5) permits the government to "spot check" even innocent conversations to determine whether the subject of the conversation has shifted. *United States v. Losing*, 539 F.2d 1174, 1180 (8th Cir.1976) *cert. denied* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977) Courts recognize that, "[a]t any moment, the pleasantries might cease and the business begin." *United States v. Suguet*, 547 F.Supp. 1034, 1037 (N.D.Ill.1982) Thus, in all likelihood, the government would still have obtained the conversations complained of during subsequent "spot checks". The defendants' contrary analysis, however, does not provide for the resumption of monitoring at any point prior to the end of an initially "innocent" conversation.

Finally, even if some authority did not exist for the suppression of specific criminal interceptions based upon a prior failure to minimize, it would not be applicable here. All except one of the conversations complained of were intercepted relatively early in the surveillance. Thus, no prior pattern of innocent conversation had developed between the interceptees. Moreover, at least one of the interceptions involved an individual who's voice was not contained on the monitoring agents' "familiarization tape". Finally, the general circumstances of each of the intercepts provided the agents with grounds for suspicion. Thus, in any event, the monitoring agents were not under a duty to minimize. The defendants' motion to suppress specific intercepts is, therefore, denied.

### e. Failure to Record

▮ Finally, defendants object to the monitoring agents' failure to record and minimize while listening to Judge Olson's empty chambers. While this court shares the defendants' general concern that such a

rules. Defendants contend that conversation should have been minimized prior to the interception of the purportedly criminal discussion. If the conversation had been properly minimized, the defendants contend the portion of the conversation triggering the abandonment of

the special minimization rules would not have been intercepted.

**16.** 18 U.S.C. § 2517(5) governs the interception of *unrelated criminal conversations* outside the scope of the authorized surveillance.

practice hypothetically could result in the loss of important communications, this court cannot find that the procedure violated § 2518(8)(a). As previously noted, that section merely provides that, if possible, the contents of any "oral communications" intercepted by electronic surveillance be recorded. Silence in an empty chambers, whether anyone was present or not, does not qualify as "oral communication". Moreover, the defendants have offered absolutely no evidence to indicate any conversations were actually lost as a result of the procedure. *United States v. Daly,* 535 F.2d 434, 442 (8th Cir.1976) The agents testified that as soon as *any noise* was detected in the chambers they immediately resumed recording. Thus, the government's failure to record while listening to Judge Olson's empty chambers did not constitute a violation of the Act.

## F. Second Application and Authorization

■ Finally, defendants move to suppress the fruits of the extended surveillance on the grounds that the finding of probable cause for the second order was based upon conversations obtained by specific failures to minimize and upon an intentional misrepresentation of the contents of an intercepted conversation between Judge Olson and Costello. This court has previously rejected the defendants' arguments with respect to the specific failures to minimize and finds no misrepresentation regarding the government's recitation of the subject conversation. Consequently, defendants' joint motion to suppress the fruits of the second authorization is denied.

## G. Costello's Motion to Suppress

■ Defendant, Costello, also filed a separate motion to suppress the consensual recordings obtained by Terry Hake. While recognizing that consensual recordings have been found not to violate reasonable expectations of privacy, defendant, Costello, contends the instant consensual recordings are distinguishable because of their kind and degree. Specifically, defendant,

Costello, points out that Hake recorded hundreds of hours of conversations, including conversations between Costello and his clients and between Costello and Hake, when Hake was acting as Costello's attorney. Finally, defendant, Costello, seeks to disqualify Hake as a witness against him because of their former attorney-client relationship.

Even if Hake was an "indiscriminate recorder", the government contends that suppression of his consensual recordings would not be justified. As a practical matter, the government notes that defendants often contend more selective recording suggests exculpatory statements were edited or omitted. The government also denies that any attorney-client relationship ever existed between Hake and Costello, and in any event, contends that it was destroyed by the crime and fraud exception to the privilege. Moreover, the government contends that it has no intention of introducing any of Costello's statements to Hake dealing with the cases in which Hake represented him into its case-in-chief.

Neither Title III or the Constitution prohibits the recording of a conversation when a party to the conversation consents to its interception. *See* 18 U.S.C. § 2511(2)(c) (1982) and *United States v. White,* 401 U.S. 745, 749–52, 91 S.Ct. 1122, 1124–26, 28 L.Ed.2d 453 (1971); *see also United States v. Boley,* 730 F.2d 1326, 1332 (10th Cir. 1984); *United States v. Kelly,* 708 F.2d 121, 124 (3rd Cir.) *cert. denied,* —— U.S. ——, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983); and *United States v. Salisbury,* 662 F.2d 738, 739–40 (11th Cir.1981) *cert. denied* 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982). Moreover, this court has not been made aware of, or located, any authority limiting the scope or duration of such recordings. Thus, defendant, Costello's, motion to quash the subject consensual recordings is denied.

Finally, in view of the government's representation that it will not utilize any of the consensual recordings regarding Hake's asserted representation of the defendant, this court need not decide whether those specif-

ic recordings should be suppressed. In addition, so long as Hake will not testify concerning the cases in which he represented Costello, this court need not decide whether Hake should be excluded from testifying concerning his other transactions with the defendant. Thus, defendant, Costello's, motion to prohibit Terry Hake from testifying is denied.

### III. CONCLUSION

For all of the reasons set forth herein, the defendants' various motions are denied. The parties are ordered to appear for a status hearing on June 17, 1985 at 10:00 a.m.